WILLIAM C. COTTON, executor, *vs.* ATLAS NATIONAL BANK & another.

Suffolk.    Jan. 24. — Sept. 7, 1887.    C. ALLEN & HOLMES, JJ., absent.

If A. transfers shares of stock owned by him to a bank, as collateral security for the promissory note of B., and, on the note becoming due, a new note is given by B. to the bank in renewal, the parties to the note not intending that the debt represented by the original note shall be thereby paid or discharged, the bank is entitled to hold the shares of stock as security for the payment of the new note, even though the renewal is made after the death of A.

A., at the request of B., transferred shares of stock to a bank as collateral security, knowing that the bank was to lend money to C., and leaving the details of the transaction to B., who was her son and her general agent.  B. procured his promissory note to be discounted at the bank, and the money thus obtained was given to C.  The note stated that the shares of stock were held as collateral security.  New notes were given from time to time in renewal of the old note, and one of these stated that the shares were held as collateral security for any liability of B. due or to become due to the bank, and that might be afterwards contracted.  This was done inadvertently, and without any intention to pledge the shares for any liability other than that for which they were originally pledged.  After the death of A., B. being indebted to the bank on one of the notes given in renewal and on another note for which certain shares of stock were pledged as collateral security, and both notes being then overdue, B. gave a new note for the amount due on both of the overdue notes, and this note stated that certain shares of stock were pledged as collateral security for its payment.  These shares were the same as those before pledged as security for both notes.  Partial payments were made on the new note from dividends and sales of the shares pledged by A.  *Held,* on a bill in equity by the executor of A.'s will against the bank, that the defendant was entitled to hold the shares of stock for the original debt contracted by B., after deducting the payments that had been made.

BILL IN EQUITY, filed January 1, 1886, by one of two executors of the will of Arria Cotton, against the Atlas National Bank and Frank B. Cotton, co-executor of said will, to compel the

defendant bank to account for and pay over to Frank B. Cotton
and the plaintiff, as co-executors of said will, all moneys received
by the bank from the sale of certain stocks and from dividends
thereon, and from checks drawn by Frank B. Cotton as executor
of said will upon the funds of the estate of Arria Cotton depos-
ited with said bank, and to transfer to Frank B. Cotton and the
plaintiff, as co-executors of said will, the stocks pledged by her
to secure the note of Frank B. Cotton ; and to restrain the bank
and Frank B. Cotton from transferring and paying over said
moneys and stocks to any person except Frank B. Cotton and
the plaintiff jointly, as co-executors of said will, and from med-
dling with the same or exercising any power or authority over
the same ; and for further relief. Hearing before *W. Allen*, J.,
who reserved the case for the consideration of the full court.
The facts appear in the opinion.

*E. R. Hoar & G. W. Estabrook*, for the plaintiff.

*A. L. Soule & G. M. Stearns*, for the defendant bank.

W. ALLEN, J. This case was heard by a single justice, and
reserved for the full court. After the evidence was printed, the
defendant moved, before the justice who heard and reserved the
case, that the reservation be discharged and the case reopened
for the purpose of taking further testimony. The court, after
hearing, discharged the reservation, and, after hearing further
evidence, reserved the case upon the bill, answer, replication, and
evidence, including all the evidence taken at both hearings, sub-
ject to the objection of the plaintiff.

The question thus presented of the authority of a single justice
to discharge a reservation and hear further evidence is ren-
dered immaterial by the agreement at the argument before the
full court, that, if the court should be of opinion that the addi-
tional evidence was such that it should be received by the full
court, or that the reservation should be discharged and the case
sent back for further hearing, the court might consider all the
evidence reported as if included in the first reservation. As we
think that the reservation should be discharged for the purpose
of receiving the evidence, we have considered the whole evi-
dence reported as before us under the agreement, and have no
occasion to consider whether the authority to discharge the res-
ervation is exclusively in the full court.

On December 27, 1877, Mrs. Arria Cotton transferred certain shares of stock to the Atlas Bank as collateral security for the promissory note of Frank B. Cotton to the bank for $50,000. Mrs. Cotton died on March 17, 1880, and William C. Cotton, the plaintiff, and said Frank B. Cotton were her executors. The note was on four months' time, and, when it became due, it was renewed, by discounting a new note on the same time, and the renewals were continued as each note became due, the interest being paid at each renewal, until September 27, 1881. The note of that date was not taken up at maturity, but was kept along until January 29, 1883, during which period payments were made upon it from dividends and sales of some of the stocks. At that time the bank held another overdue note of said Frank B. for $19,000, and a new note was given by him to the bank for the amount due upon both notes. The plaintiff, as the executor of Mrs. Cotton, contends that these transactions constitute payment of the debt for which her stock was pledged; and that, if the debt was not extinguished, the conduct of the pledgee, the defendant bank, was such as to release the security.

Mrs. Cotton was not a party to the original debt, and the question whether it has been paid or discharged, or satisfied by the giving and acceptance of a new note, must depend upon the acts of the parties to it. This court has held that taking a negotiable note for a preëxisting account or note is *prima facie* a discharge of the old debt, and a substitution for it of the new note. It is a question of intention, and the intention to discharge the old note is presumed when a different intention is not shown by evidence or inferred from circumstances. When it appears that it will be for the benefit of the creditor that the old debt should be kept alive, the presumption does not arise, and the debt is not discharged. Accepting a negotiable note for a secured debt will not discharge the debt, because it will not be presumed that the creditor intended to give up his security. *Pomroy* v. *Rice*, 16 Pick. 22. *Appleton* v. *Parker*, 15 Gray, 173. *Dodge* v. *Emerson*, 131 Mass. 467. *Green* v. *Russell*, 132 Mass. 536. And the rule is the same even though the new note includes a new debt. *Taft* v. *Boyd*, 13 Allen, 84. *Hill* v. *Beebe*, 3 Kern. 556. *Brinckerhoff* v. *Lansing*, 4 Johns. Ch. 65.

In the case at bar, the evidence shows plainly that the parties to the original debt did not intend that anything that they did should be a payment or discharge of it. The debts and the notes were as distinct in their minds as they were in reality. It was not intended or expected that the debt should be paid when the first note should mature, but that the note should be renewed and the debt kept along, the bank at all times holding for it a note not overdue. This was in fact done until the maker failed to renew the note, and allowed it to be dishonored. As soon as practicable after that, the bank procured the renewal of the note in connection with the other dishonored note of the maker. The bank clearly intended to retain its hold upon its securities, and it took the new note, not in payment or satisfaction of the debt, but only in renewal of the overdue note. It is unnecessary to consider in detail the evidence of this; no other inference can be drawn from it.

The consideration of the other question requires a more particular reference to the evidence. The plaintiff contends that Mrs. Cotton, as the general owner of the pledged stock, stood to the defendant bank in the relation of a surety upon the note; that any conduct of the bank in regard to the note which would discharge a surety upon it would release the security pledged by her; and that the renewals of the note, — which, while they did not discharge the debt, gave time to the debtor, — the change in the terms of the memorandum of the pledge written on the renewed notes, and the mingling of the debt and security with another debt and other security when the "consolidated" note was given, operated to release the security. Before considering these in detail, it is necessary to look at the relation of Mrs. Cotton to the debt, and the authority given by her in regard to the security. Mrs. Cotton was a woman of large wealth, principally invested in business corporations in her neighborhood. Frank B. Cotton was her son, and her general agent, acting under her direction, advising and representing her in many business matters. William P. Hunt was the president of the defendant bank when the first note was given. He was also the president and treasurer of, and largely interested in, the South Boston Iron Company. Frank B. Cotton was interested in that company, and in other concerns with Hunt, and had close personal and

business relations with him.   Mrs. Cotton had lent money to Hunt at different times for which there was due to her about $70,000, which was secured, and for which Hunt personally was considered amply responsible.   Hunt wanted to borrow $50,000, and Frank B. applied to his mother to lend stock as collateral security for it at the bank, representing to her that Hunt wanted the money to use in his business, to enlarge it and make it more prosperous.   Other considerations were mentioned, as that the business had been very prosperous, that it was likely to become much more so by taking certain contracts and extending its business, and that Hunt might have an opportunity to secure an interest in it at a low rate for Mrs. Cotton, and the fact that Hunt already owed Mrs. Cotton $70,000, secured by collateral, some of which was the stock of the South Boston Iron Company. These and other considerations were urged by the defendant as showing that Mrs. Cotton, and not Frank B., was the real debtor who borrowed the money of the bank on the note of Frank B.

But we do not find it necessary to decide that question.   In the view which we take of the evidence, the material fact on this point is that Mrs. Cotton furnished the stocks on the representation and expectation that they were to be used as security for money to be lent by the bank for Hunt to use in his business. She left the details of the transaction to be arranged by Frank B. He told her that he was to give his note to the bank, but it does not appear that she knew when it was to be payable.   If it is to be inferred that she understood that it was to be a short-time note, to be discounted by the bank, it is also to be inferred that she understood that the loan was to be kept along by renewed discounts.   Waiving the question which was the principal debtor as between her and Frank B., as between her and the bank she lent the stocks to Frank B. to use as security for a loan for an indefinite time from the bank to him upon his note, in such form and manner as he saw fit.   The right to limit the time of payment of the debt by the first note discounted, and to extend it by renewal notes to be discounted, which was given, was not a mere authority or license which determined upon the death of Mrs. Cotton; it was a right so to use the stocks, under which the arrangement with the bank was made, and the money was

paid by it, and the liability of Frank B. upon his note was in-curred. The fact that the stock was transferred directly from Mrs. Cotton to the bank did not limit the authority of Frank B. in pledging the stock; he procured and delivered to the bank the assignment from Mrs. Cotton to it, and the bank had no other communication with her in regard to it.

The original note, and the first renewal note, dated April 30, 1878, had indorsed upon them a list of the stocks, which were referred to in the body of each note as deposited " as collateral security." A subsequent note contained the words, referring to the list of stocks in the note of April 30, 1878, " as collateral security for payment of this or any other direct or indirect lia-bility of ours to said bank, due or to become due, and that may be hereafter contracted." There was no authority to pledge the stock for other liabilities of Frank B. It does not appear that at that time there was any other liability of Frank B. to the bank, and it does appear that there was no intention to pledge the stocks for any other debt than the $50,000 for which it was already pledged. The change from the memorandum on the former notes seems to have been made inadvertently, by using a common form; no right was acquired against the plaintiff which did not exist before, and none has ever been claimed by the bank, or was intended by it. This cannot have the effect of releasing the security.

On January 29, 1883, the $50,000 note had been about a year overdue, and there was then due upon it $25,375.12, and some interest. The $19,000 note of Frank B. to the bank was more than a year overdue, and there was due upon it $18,300, and some interest. This note was secured by one hundred shares of the Manchester Mills. The whole amount of interest then due on both notes was $895.66. The amount of interest then due upon each note was then computed, and can now be ascertained by computation, but is not stated in the evidence. The bank had been endeavoring to procure a settlement of both of the overdue notes. At that time an arrangement was made; the whole amounts due upon both notes were added together, mak-ing $44,570.78. The sum of $2942.03 was paid from the estate of Mrs. Cotton, in two checks drawn by Frank B. Cotton, execu-tor, and a new note on four months' time was given by Frank B.

for $42,500, being the balance due, with the discount on the new note. This note was stated to be secured by certain stocks, which were in fact the same as those before pledged as security for both debts. Payments amounting to about $10,000 have been made on the consolidated note, from dividends and sales of the stocks pledged by Mrs. Cotton.

As has been before said, this transaction was not a payment of the $50,000 debt, and we do not think that its effect was to discharge the security. It did not affect the title to the stock, or give to the bank any new right to it. The bank held under the transfer to it from Mrs. Cotton, and not under the memorandum on the note. The writing on the note gave no right or title to the stock, and was not intended to give any. It was a statement in the note of a fact existing outside of it. The stock was, in fact, held as security for a debt represented in the note; and so far the statement was true. If the statement can be construed only as meaning that the stock was held as security for the full amount of the note, it was not true in fact; but how was Mrs. Cotton's estate prejudiced by the false statement? The recital did not alter the fact, or give any additional right in the stock to the bank, nor in any way affect the action of the bank in respect to it. The respective stocks stood pledged for the respective debts, as they did before, and Mrs. Cotton's stock, at least, did not become pledged for anything more. In regard to giving time upon the $50,000 debt, the effect upon that debt and its security by renewing the note as part of a larger note was the same as if it had been renewed alone. The right of action was suspended until the maturity of the new note; but upon non-payment of that, it revived as it was before, and payment of the original debt would release the security as fully as if the new note had not been given. The defendant at no time claimed to hold the stock pledged by Mrs. Cotton for anything but the debt for which it was pledged. The two notes appear to have been consolidated at the request of the bank and only for convenience, and without any intention of affecting the rights of Mrs. Cotton's estate in the stock, and nothing has occurred by which the estate has received any detriment in consequence. The amount of the debt can be ascertained, and the payments made properly applied, with as much certainty, and by the same

computations, as if the new note had not been given.   The right to redeem the stock was not impaired or hindered by the form in which the renewal of the note was made.   The renewal was with the concurrence of the executors, was a waiver by the bank of its right to an immediate sale of the stock, and in that re-spect was apparently beneficial to the estate; and we do not think that the right of the bank was forfeited by it.

The payments upon the consolidated note have all been from the estate of Mrs. Cotton, and must be regarded as applied to the debt secured by her stock.

Most of the payments that have been made upon the debt were from the avails of the pledged stock, but several pay-ments were made by Frank B., as executor, from the funds of the estate.   It does not appear that these payments were not for the benefit of the estate.   If the value of the prop-erty pledged exceeded the amount of the debt, it might be clearly for the benefit of the estate to pay the debt and release the property.

On the whole evidence, we do not see any ground upon which the bill can be maintained.                    *Bill dismissed.*