## FARMERS' LOAN & TRUST CO. v. MADISON MFG. CO.

### In re MASSASOIT–POCASSET NAT. BANK.

(Circuit Court, N. D. Alabama, N. D.   December 15, 1906.)

1. CORPORATIONS—MORTGAGES—BONDS—EXECUTION.

    In proceedings for the foreclosure of a mortgage securing bonds of a corporation, evidence *held* to sustain a finding that the entire issue contemplated and secured by the mortgage were outstanding obligations of the corporation.

2. SAME—BONDHOLDERS—ESTOPPEL.

    Where corporate bonds in controversy were issued under a certain contract, the holders of a part of the bonds were estopped, while claiming the right to enforce the same, to assert that others were unenforceable because of the alleged illegality of the contract.

3. SAME—BONA FIDE HOLDERS.

    Where a treasurer of a corporation borrowed certain money from a bank, which he used for the corporation's benefit, and pledged to secure the same certain of the corporation's bonds, the bank was a bona fide holder of such bonds, and entitled to enforce the same to the extent of the money so applied to the corporation's benefit, regardless of the treasurer's authority to execute notes for money borrowed for the corporation.

4. PAYMENT—RENEWAL OF NOTES.

    Where the treasurer of a corporation borrowed certain money from a bank for the benefit of the corporation, and pledged certain of its bonds as collateral, the fact that such treasurer and his firm gave new notes for such indebtedness, including further advances, the last of which stated on their face that the bonds were held as collateral, did not constitute payment of the original indebtedness.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Payment, §§ 78–86.]

5. PLEDGES—BONDS—BONA FIDE PURCHASER—NOTICE.

    Certain corporate bonds, payable to bearer and duly certified by the trustee to have been properly issued, came into the hands of the corporation's treasurer, pursuant to certain reorganization contracts between the person controlling the corporation and himself, after which they were pledged by the treasurer to a bank to secure debts of his firm. *Held* that, in making such pledge, the treasurer acted personally, and not as an officer of the corporation, and, having possession of the bonds with all the indicia of title, the bank was not charged with notice of any infirmity

therein because it had knowledge of the treasurer's official connection with the corporation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Pledges, §§ 48-50.

Rights and liabilities of pledges of corporate stock, see note to Frater v. Old Nat. Bank, 42 C. C. A. 135.]

In Equity.

Richard W. Walker and Robert E. Spragins, for claimant bank.

Milton Humes, Paul Speake, Lawrence Cooper, and E. H. Foster, Jr., for contestants.

SHELBY, Circuit Judge. On the 1st day of January, 1903, the Madison Manufacturing Company, an Alabama corporation, executed a mortgage or deed of trust on its real estate and personal property to the Farmers' Loan & Trust Company, a New York corporation. The amount of the indebtedness secured by the mortgage is $100,000, evidenced by the bonds of the company of the same date as the mortgage, each for $500, and payable 20 years from that date to the Farmers' Loan & Trust Company, or bearer, at its office in New York, with interest at 6 per cent., payable semiannually; each bond being signed by the president and secretary of the Madison Manufacturing Company, coupons for the interest being attached to each bond, and each coupon being signed by the lithographed signature of the treasurer of the Madison Manufacturing Company. The bond provided that it should not become "obligatory until the certificate thereon endorsed shall be signed by the Farmers' Loan & Trust Company, Trustee." The certificate to each bond was duly signed, and was in these words: "This bond is one of the series of bonds described in the within mentioned mortgage or deed of trust."

After the issuance and negotiation of the bonds, default was made in the payment of interest, and by the terms of the mortgage this default made the entire debt due. Thereupon, the Farmers' Loan & Trust Company filed the bill in this cause against the Madison Manufacturing Company to foreclose the mortgage. It is alleged in the bill that on the 1st of January, 1903, the company did "execute and issue its certain first mortgage bonds, dated that day, for the sums respectively of $500 each, aggregating the sum of $100,000"; and that "all of said bonds have been duly issued and are outstanding and existing obligations on the part of the mortgagor company in the hands of bona fide holders for value."

On September 21, 1905, a final decree of foreclosure was entered. Among other things, this decree adjudged that "there are secured by said mortgage bonds of the said defendant Madison Manufacturing Company to the amount of $100,000 of principal." After providing for the sale of the mortgaged property, the decree directs the disposal of the proceeds by the payment of certain prior liens and expenses, and then "to the payment of the amount found due upon the indebtedness secured by the said mortgage or the amounts of the indebtedness of the said defendant mortgagor company for which the said bonds may be pledged as collateral." It is, also, adjudged in the final decree "that all of the said bonds [referring to the $100,000 of bonds] se-

cured by said mortgage were duly executed by said defendant Madison Manufacturing Company, and certified and delivered by the plaintiff as trustee, and that some of said bonds so executed and certified were duly issued by said Madison Manufacturing Company as collateral security for moneys advanced to said company"; and the special master was directed "to ascertain and report with all convenient speed the names of the holders of said bonds, and which of said bonds are held absolutely and which as collateral security." It appears clearly from the bill and from the decree that "all of said bonds [referring to the issue of $100,000] have been duly issued and are outstanding and existing obligations on the part of the mortgagor company," but that some of them are "held absolutely," and that others are held "as collateral security." There is no question made in the pleadings in the original case, or left in doubt by the decree, of the fact that the entire $100,000 of bonds were issued and outstanding. The decree further provided that the holders of the bonds might present their claims in this cause. Pursuant to this decree, the Massasoit-Pocasset National Bank of Fall River, Mass., presented to the special master 50 of the bonds for $500 each, which it claimed to hold as collateral security to secure two notes, one for $10,000, and one for $6,500, made by the firm of Knight, Fyans, Fraser & Blackway Company.

Milton Humes, who intervened in the cause, made himself a party to the proceedings before the special master, and filed the following objections to the claims of the Massasoit-Pocasset National Bank:

"(1) That the said bonds were obtained by the said Massasoit Bank without their proper negotiation, and that the same are not entitled to any distribution from the fund in hand in this cause for distribution.

"(2) The said bank is not entitled to any distribution on account of the said $25,000 of bonds out of the fund now in the hands of this court for distribution in this cause.

"(3) The said Massasoit Bank got said bonds from Albert F. Knight and J. T. Fyans, who were directors of the Madison Manufacturing Company at the time and were known as such by the officials of the said Massasoit Bank, and there was no valuable consideration paid therefor by the said Knight and Fyans, or any one else, and the said bonds in the hands of the said Knight and Fyans, or their transferees or assignees, are not entitled to distribution out of any fund in this cause.

"(4) Said bonds were in the hands of the said Milton Humes, who held the same as security for the payment of indebtedness due to him by the said Madison Manufacturing Company, and the said indebtedness has never been paid, but the same is due and unpaid, amounting in the aggregate to more than the face value of said bonds and the coupons attached thereto, including principal and interest, and the said Knight and Fyans, under whom the said bank claims the said bonds, procured the same from the said Humes by fraudulent representation, and the said bonds so in the hands of the said bank are chargeable with the said misrepresentations of the said Knight and Fyans, and are not entitled to any portion of the fund in this cause arising from the sale of the property under the decrees of the court.

"(5) Said bonds there was never any consideration received therefor by objectant, Milton Humes, who is the legal and proper holder and owner thereof, and the same are held by the present holder, who has obtained the same from A. F. Knight and J. T. Fyans and associates by fraud and misrepresentation from the said Milton Humes, who is the proper and legal owner and holder of the same.

"(6) The said Milton Humes says that the said Massasoit Bank has no claim to or interest in the said bonds, but the same belonged to and are the prop-

erty of Milton Humes, who files these objections and exceptions to the claim of the said bank thereto.

"(7) The said bonds were held and owned by the undersigned Milton Humes for a valuable consideration, and he is now the party legally entitled thereto and to all distribution on account thereof of the fund now in hand in this cause, and the said Massasoit Bank, and those under whom it claims, are not entitled to any distribution of the fund in hand on account of the said bonds; the same having been procured from the said Humes by fraudulent conduct and misrepresentation of A. F. Knight and J. T. Fyans, from whom the said Massasoit Bank obtained the same, and without the said Knight and Fyans having paid any valuable consideration therefor. The said Knight and Fyans, at the time that they negotiated the said bonds with the said bank, were officers and directors of the Madison Manufacturing Company, which the officials of the said Massasoit Bank knew, and the said Knight and Fyans at that time held the said bonds and had procured possession of the same by fraudulent conduct and false representations and misrepresentations and without any consideration whatever, from said Milton Humes."

The First National Bank of Decatur, Ala., and seven others, the holders of other bonds of the Madison Manufacturing Company, subsequently filed objections to the bank's claim, adopting the grounds of objection propounded by Humes, and stating no others. The questions raised by these objections were referred to the special master.

On the hearing before him two contracts were offered in evidence, relating to the issuance and disposal of the bonds. It is necessary here to state their substance. The one dated November 11, 1902, between Milton Humes "and associates" and Albert F. Knight "and associates," states that Humes and associates own all the capital stock and bonds of the Madison Spinning Company, an Alabama corporation. It provides that the name of the corporation is to be changed to the Madison Manufacturing Company, and the stock increased from $100,-000 to $300,000. Humes and associates are to contribute the property of the old corporation to the new. Knight agrees to furnish cotton machinery and supplies necessary for a 15,000 spindle mill, with 400 looms to be practically as good as new, a good deal of which machinery, it is stated in the contract, is now in what is known as the "Farnumsville Mill," in Massachusetts. Knight and associates are to furnish other machinery, all of which is to be subject to the approval of E. F. Green, a mill engineer. The contract further provides that $100,000 in preferred stock is to be issued, and $200,000 in common stock. The stock is all to be issued as fully paid up. Of the preferred stock, $25,000 was to be sold, and the proceeds placed in the treasury of the company. Humes was to get $50,000 of it, and Knight $25,000. Of the common stock, Knight was to get $102,500, and Humes $97,500. The company was to issue $100,000 in bonds, and the contract provides that the bonds should be sold at par, and that Knight was to get $60,-000 of the proceeds, and the proceeds of the sale of the remaining $40,000 should go into the treasury of the company. It is shown in the contract that the Farnumsville Mill was incumbered in the sum of $38,000. Humes was to advance this sum and take a transfer of the lien upon the property. He also agreed to advance to Knight an additional amount, so as to make the entire amount advanced under the contract to Knight amount to $50,000; "it being understood that the said Humes and associates are to be reimbursed for this amount by the

return thereof out of the $60,000 the said Knight and associates are to get out of the proceeds of the sale of the said $100,000 of bonds of the said Madison Manufacturing Company." The evidence in the case shows that Humes advanced the sum of $38,000, as agreed, but failed to advance to Knight and associates the $12,000 additional.

While this was the business situation between them, on August 28, 1903, they made another agreement supplementing the first one, and it was under this last agreement that $25,000 of the bonds—being part of the $60,000 received by Humes—passed into the hands of A. F. Knight.

The second agreement is as follows:

"Whereas, Milton Humes for himself and associates, and A. F. Knight for himself and associates, did on the 11th day of November, 1902, enter into an agreement in reference to the Madison Spinning Company changing its name to the Madison Manufacturing Company, and increasing its capital stock to $300,000.

"Whereas, under and by the terms of the said agreement, Milton Humes agreed to advance the sum of $38,000, to pay off a mortgage on the mill plant of the Farnumsville, Mass., Cotton Mill, and was also to advance said Knight and associates an additional amount of $12,000, for the purposes mentioned in said agreement, and said Knight was to get $10,000 more of proceeds of said bonds when sold.

"Whereas, the said Humes has advanced the $38,000 and received the said $60,000 of bonds as security, contemplated and provided he should receive under said agreement, and has made other advances to the Madison Manufacturing Company, to enable it to complete its plant, but has not advanced to the said Knight and associates the $12,000 additional which he agreed to advance:

"Now this agreement witnesseth: That in consideration of the said Humes turning over to the said Knight and his associates $25,000 of the $60,000 of bonds received by him as aforesaid, the said Knight and associates releases the said Humes from his obligation to furnish said $12,000 and accepts said $25,000 of bonds for $22,000 of the $60,000 which they were to receive out of the proceeds of the sale of said bonds. Said Humes agrees to advance to the Madison Manufacturing Company an additional sum sufficient for the completion of the plant, retaining the unsold bonds of the company as security therefor; it being understood and agreed that the agreement of date November 11, 1902, is modified to the extent herein provided.

"It is further agreed: That if the said Humes at any time provides said Knight with said $12,000, in that event, said Knight, upon the receipt of said $12,000 agrees to return said $25,000 of bonds, and the agreement reverts to the original agreement of November 11, 1902, in regard to said bonds. Said Knight is to receive and hold said bonds subject to agreement signed by him and said Humes, giving to J. B. Cobbs option on said bonds.

"Signed in duplicate August 28, 1903.                    Milton Humes.
                                                          "A. F. Knight."

Soon after this last agreement was signed, on September 8, 1903, the $25,000 of bonds in question were sent by C. C. Harris from Alabama to Knight. The bonds had been left with Harris by Humes. Harris was at the time treasurer of the Madison Manufacturing Company. Knight, receiving the bonds, deposited them as collateral to secure money borrowed by his firm, Knight, Fyans, Fraser & Blackway Company, from the Massasoit-Pocasset National Bank.

The special master reported against the bank. He did not, however, report in favor of Humes. He reported that the $25,000 of bonds "are really the property of the Madison Manufacturing Company." He found that the bonds in question were turned over to Albert F.

Knight and J. T. Fyans by Milton Humes; that Milton Humes was the president of the company; that the bonds were delivered to Knight and Fyans for certain machinery which was to be furnished by them to the company upon a contract that the machinery was to be practically as good as new; that the machinery did not conform to this contract, but, on the contrary, was practically worthless for the purposes for which it was intended. As bearing on the question as to whether or not the claimant bank was a bona fide holder without notice of the bonds in question, the special master found the following facts: That Knight and Fyans were both directors of the Madison Manufacturing Company at the time they received the bonds and at the time they deposited them with the bank as collateral security; that the bank took the bonds with notice that Knight and Fyans were directors of the Madison Manufacturing Company. The special master concludes his report on this branch of the subject by holding that the claimant bank "has not shown good faith in acquiring and holding the bonds in question."

The claimant bank duly filed objections and exceptions to the report of the special master, and, among other grounds of exception, alleged the following:

"That said special master should have found from the evidence that $5,000 of the indebtedness, as security for which the claimant bank holds the bonds in question, was advanced by the claimant bank on the note of the Madison Manufacturing Company, secured by the indorsement of Knight, Fyans, Fraser & Blackway Company; that the money so advanced was placed by claimant bank to 'the credit of the Madison Manufacturing Company, and was drawn out on checks of said company issued for the uses and purposes of said company; that said note of said Madison Manufacturing Company has not been paid, but said Knight, Fyans, Fraser & Blackway Company had to give their note for the amount thereof; and that said bank is entitled to hold said bonds for security for the amount so advanced to said company thereon. And in support of this exception claimant bank refers the court to the testimony of E. W. Borden and A. F. Knight in reference to said note, and the use of the proceeds thereof."

"That the said special master in his said report finds that said claimant bank has not shown good faith in acquiring and holding the bonds in question; whereas, said special master should have found from the evidence that said bank received said bonds in pledge to secure money actually advanced on the faith thereof, and that the evidence wholly failed to show that said bank acquired said bonds with notice of a defect in the title, or in bad faith. And in support of this exception exceptant refers the court to the testimony of said E. W. Borden and said Knight and Fyans."

The foregoing statement of the pleadings, issues, and parts of the evidence gives an outline of the case. In discussing the several points presented, it will be necessary to make additional statements of fact which relate especially to the question considered.

1. The original bill in the cause asserted, and the decree of foreclosure adjudged, that the whole series of bonds is outstanding; that no part of them is retained in the treasury of the company. The company nowhere in the record denies that all the bonds are outstanding. Taking the objections filed by Humes and adopted by the bondholders, and construing them in the light of the record, they seem to raise a controversy as to whether the pro rata share of the proceeds of the foreclosure sale should go to Humes or to the claimant bank. In the sixth objection, for example, it is asserted that the claimant bank has

"no claim to or interest in said bonds [referring to the $25,000 of bonds in question], but the same belonged to and are the property of Milton Humes, who files these objections." This objection, and others like it, is adopted by the contesting bondholders. The first objection, however, is to the effect that the bonds "were obtained by the claimant bank without their proper negotiation," and that is construed in the argument of counsel to mean that the bonds were never issued, and are not outstanding. This contention, it will be observed, conflicts with the averments of the bill and the final decree, both of which are to the effect that the entire $100,000 of bonds are outstanding obligations; and it also conflicts with the uncontradicted evidence. The bonds are regularly signed; the proper certificate of their issuance is signed by the trustee; and the record shows that the entire series is receiving dividends in this case, except the $25,000 of bonds in controversy. The evidence shows that they are a part of the $60,000 that went to Humes as security for at least $38,000 that he advanced for the benefit of the company, and that $25,000 of this $60,000 of bonds passed from Humes to Knight to pay or secure $12,000. Can there be any doubt on the evidence that the bill and decree of foreclosure speak the truth, when they say that the entire series has been issued and is an outstanding obligation of the company? The evidence seems to me to be conclusive on that subject; but the question remains as to whether the claimant is entitled to the dividends on the 50 bonds.

2. It is contended in behalf of the contestants in their brief that the contract of Humes and associates with Knight and associates, made November 11, 1902, "affirmatively discloses that it is a promoter's contract, parceling between themselves the stock and bonds to be issued by the Madison Manufacturing Company"; and it is asserted that such "an instrument is wholly without any validity against the rights of creditors or stockholders of the company." This objection and argument is made by contesting banks who own $54,500 of the company's bonds. If the $25,000 of bonds involved here are made void by the illegality of the contract of November 11, 1902, the whole issue of bonds was subject to the same objection, unless, of course, they have passed into the hands of bona fide holders; for the whole series of $100,000 of bonds was issued pursuant to the terms of that contract. The contract, however, shows that the stock that was to be received by Humes was to be received in consideration of the interest which he held in the Madison Spinning Company and cash which he was to advance for the benefit of the company, and the bonds and stock which were to be received by Knight and associates were to pay for machinery which he was to furnish and services that he was to render. The $60,000 of bonds which went into Humes' possession was received by him in consideration of cash—$38,000, which, by the contract, he was to advance for the benefit of the company. I do not think that the court, on the issues here joined, is called on to decide, as between the parties to this suit, whether the contract in question is valid or not. The question is not raised here by any one except the bondholders themselves. Those who raise the question are in court in this case, receiving money on bonds of the same series with those they contest. They are, I think, estopped from alleging the invalidity of the bonds

because of the alleged illegality of the contract, when they are here to collect other bonds issued pursuant to the same contract, and just like those to which this objection is made. They cannot hold out an open hand to receive the cash proceeds of the transaction, and at the same time be heard to say that the very foundation of their own claim is invalid.

I do not understand that it is claimed that the contestant, Humes, a principal party to the contract, can gain any advantage by assailing it; nor do I understand him to dispute its validity. On the contrary, Humes' claim is based on the contract and on his averment that Knight has breached it.

3. The report of the special master refers to the fact that the bank held the note of the Madison Manufacturing Company for $5,000, and that the amount of this note was advanced on the bonds; but the report does not show whether this money was received by the company or not. Turning to the evidence of E. W. Borden, we find that he testifies that the bank, on the security of the bonds, lent "$5,000 on a note of the Madison Manufacturing Company on their indorsement" —referring to the indorsement of Knight's firm. The bonds were held to secure this sum advanced on the note of the Madison Manufacturing Company. What became of this money? The report is silent on the subject; but Borden, the cashier of the bank, who had charge of the business in question, testifies that the $5,000 was placed in the bank to the credit of the Madison Manufacturing Company, and was drawn out on the checks of that company, signed by its treasurer. A. F. Knight, the treasurer at the time, who drew the checks, was asked: "What did you do with that money?" And he answered: "I used it for the Madison Manufacturing Company, purchasing cotton, paying for labor," etc. And Knight testifies that entries as to these transactions were made on the books of the Madison Manufacturing Company. The company, in common justice, could not ask the bank to surrender the bonds till it paid this $5,000 and interest. There is now due the bank $16,500 and interest for money advanced that is unpaid. Whatever question there may be about part of this sum, the company itself, according to the evidence, received the benefit of the $5,000 advanced on its note on the security of the bonds in question. I do not overlook the evidence of two officers of the company that the treasurer had no authority to execute the note of the company for the $5,000, and that the treasurer was not authorized to sign the notes of the company. There is much other evidence tending to show that the company—those in charge of its affairs as its officers— expected Knight to raise money for it; but it is not necessary to decide the question of Knight's authority to sign the note. If the company received the proceeds of the note, got the $5,000, and paid it out for cotton and labor—and that is the uncontradicted evidence—it owes the amount advanced, and the bonds stand for it. It would be the same if no note was given. The receipt of the money is the substantial thing that charges the company. The company cannot enjoy the fruits of the transaction and repudiate its responsibilities.

In Tuskaloosa Cotton Seed Oil Company v. Perry, 85 Ala. 158, 166, 167, 4 South. 635, a corporation made the defense that its officer was

without authority to sign a note upon which money was obtained. The court said:

"The note having been made to borrow money for the corporation, which it received, and having retained for its own benefit the fruits of the transaction, the defendant is estopped to deny, as against the holder from whom the money was borrowed, the binding character of the obligation, and the authority of the president to make the transaction."

The acceptance of benefits arising from a contract, even when it is made by an unauthorized agent, ratifies the contract, if it is one capable of ratification by parol. This doctrine is applicable, not only to notes, but it is applied where a corporation receives and retains the consideration of an unauthorized mortgage on personal property. Despatch Line v. Bellamy M. Co., 12 N. H. 205, 37 Am. Dec. 203; 4 Thompson's Commentaries on the Law of Corporations, §§ 5258, 5304.

The fact that Knight, Fyans, Fraser & Blackway Company gave new notes for a sum including other advances and the Madison Manufacturing Company's $5,000 note, on which they were indorsers, does not constitute payment of the latter note so as to release the collateral. The last notes, the ones now presented, state on their face that the bonds are held as collateral. Such a renewal is not a payment; it appearing that it was not the intention of the parties that it should constitute payment. Cotton v. Atlas National Bank, 145 Mass. 43, 12 N. E. 850; Brewer Lumber Co. v. Boston & Albany R. R. Co., 179 Mass. 228, 60 N. E. 548, 54 L. R. A. 435, 88 Am. St. Rep. 375; Arnold v. Delano, 4 Cush. (Mass.) 33, 41, 50 Am. Dec. 754. See, also, Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587.

Regardless of other questions involved in the case, the claimant bank is, I think, entitled to share in the distribution of the fund until the $5,000 advanced to it on the bonds is paid.

The record shows, however, that the dividends going to the $25,-000 of bonds will more than pay this $5,000, and it will be necessary, therefore, to consider the claimant bank's right to receive further payment.

4. The controlling question that goes to the whole case is whether or not the claimant bank is a bona fide holder of the bonds. Sixty thousand dollars of the series, duly executed, with the trustee's certificate duly signed, passed to the possession of Humes, to secure an advance by him of $38,000. Twenty-five thousand dollars of this $60,000 of bonds was delivered by Humes, through Harris, to Knight, under the contract of August 28, 1903. Under that contract, Knight clearly held the bonds as against Humes to secure $12,000. The correspondence in the record shows that Humes, before he discovered the defects in the machinery, made no claim to the bonds, except upon his offer to pay $12,000; and that Knight had pledged them, as I have before stated, not only for the $12,000 that his firm had borrowed of the claimant bank, but also for $5,000 borrowed for the Madison Manufacturing Company on its note. The only reason now urged why Humes is entitled to the bonds as against Knight is that Knight failed to comply with his contract of November 11, 1902, as to the delivery of machinery as good as new. But for that single fact, Humes would have no just cause for asking Knight, if he held them, to return the

bonds without the payment to him by Humes of the $12,000. There is no evidence in the record, nor findings by the special master, that the claimant bank had any notice whatever of the existence of the two contracts between Humes and Knight, or of the breach of the first contract by Knight. It does not even appear that, at the time that Knight pledged the bonds the Madison Manufacturing Company had discovered that the machinery delivered by Knight did not conform to the contract. What, then, are the facts that became known to the claimant bank which it is contended sustains the special master's conclusion that the claimant bank is not a purchaser in good faith? They are stated in the first and fifth findings of the special master: That Knight and Fyans were directors of the Madison Manufacturing Company at the time they received and pledged the bonds; and that the claimant bank had notice of that fact.

It may be well to note the general rule as established in the federal courts. The rule in these courts is that one who acquires mercantile paper before maturity from another, who is apparently the owner, giving a consideration for it, obtains a good title, though he may know facts and circumstances that would cause him to suspect that the person from whom he obtained it had no interest in or authority to use it for his own benefit, and though by ordinary diligence he could have ascertained these facts. The purchaser of negotiable paper does not owe to the party who puts it afloat the duty of active inquiry to avert the imputation of bad faith. Bank of Edgefield v. Farmers' Co-op. Mfg. Co., 52 Fed. 98, 2 C. C. A. 637, 18 L. R. A. 201; Goodman v. Simonds, 20 How. 343, 15 L. Ed. 934; Swift v. Smith, 102 U. S. 442, 26 L. Ed. 193; Brown v. Spofford, 95 U. S. 474, 478, 24 L. Ed. 508; King v. Doane, 139 U. S. 166, 11 Sup. Ct. 465, 35 L. Ed. 84.

The contention is that knowledge of the fact that Knight and Fyans were directors of the Madison Manufacturing Company deprives the claimant bank of the rights of a bona fide holder of the bonds.

There is generally a presumption in favor of honesty and fair dealing, and I can see no reason why it should not apply to a director of a corporation. When he presents to a bank a certificate of stock or a negotiable bond of his corporation, signed by the proper officers, with the seal of the corporation attached, when it is a completed instrument the title to which passes by mere delivery, requiring no transfer on the corporation's books, and offers it for sale or pledge, representing himself as the owner of it, it is difficult to see any reason for a presumption that he is about to commit a fraud. Usually, one cannot be a director of a corporation unless he is a stockholder. Directors, familiar with the condition of their corporations, often subscribe for its bonds, or buy them on the market. Are they not allowed to dispose of them without exciting suspicion of fraud by the very act of sale or pledging? The establishment of such a rule would greatly lessen the negotiable availability of such securities. I think no such rule should prevail.

In Duncomb v. N. Y., H. & N. R. R. Co., 84 N. Y. 190, 202, Bailey bought $10,000 of corporation bonds of "E. F. Mead, who was, at the time, one of its directors." The court said that there was nothing to affect his position as a purchaser for value and in good faith, "unless

the fact that he knew Mead to be a director was enough to put him on inquiry and charge him with constructive notice of the defect in the title." And the court, responding to the question, held:

"We cannot so decide. A director may be the lawful and honest holder of the bonds of his company. There is no presumption to the contrary. The fact is not even just ground of suspicion."

In Rockville Nat. Bank v. Citizens' Gaslight Co., 72 Conn. 576, 45 Atl. 361, Risley, the treasurer of the company that issued the bonds, pledged them as collateral security to secure his own renewed note. The plaintiff, when he received the bonds in pledge, knew that Risley, the debtor who was pledging them, was the treasurer of the company that issued the bonds. The court held that:

"It is idle to claim that such facts, as a matter of law, charge the plaintiff with knowledge that Risley in truth holds the bonds in a fiduciary capacity, or has obtained possession of them through a secret fraud."

In that case, the bonds had, in fact, been paid before maturity, and the company had negligently failed to cancel them and left them in the hands of its treasurer.

The same view is taken by the Supreme Court of Georgia. In Kaiser & Bro. v. U. S. National Bank, 99 Ga. 258, 25 S. E. 620, that court held, Chief Justice Simmons announcing the opinion, that, where a promissory note executed solely for the accommodation of a bank, and intended by the makers to be used for its benefit only, was made payable to the order of its cashier and indorsed in blank, the mere fact that the president of that bank negotiated the note for his own personal benefit to a third person, who knew he was such president, would not of itself be notice to that person that this action of the president was unauthorized or improper; nor would this fact be sufficient, without more, to put the third person upon inquiry as to the legality or correctness of the president's conduct in the premises.

A case involving the same question has been decided by the Circuit Court of Appeals of this circuit. The bank in that case received the negotiable notes in question from Charles B. Lloyd, who represented himself as the owner, before maturity, for a valuable consideration and without notice, "except such notice as was given by the fact that the notes presented bore an indorsement in blank by the Brunswick State Bank, coupled with the knowledge that Lloyd who presented the notes, of which he claimed to be the owner, was the president of the Brunswick State Bank." The court, by Pardee, Circuit Judge, held, after quoting the general rule of the federal courts as to what is required to charge with notice a purchaser of commercial paper, that the evidence "does not show a case where the First National Bank of Brandon was charged with any such notice of outstanding rights and equities as put it upon further inquiry. * * *" Kaiser v. First Nat. Bank of Brandon, 78 Fed. 281, 24 C. C. A. 88.

The case of Germania S.-V. & T. Co. v. Boynton, 71 Fed. 797, 19 C. C. A. 118, on which contestants rely, is one in which the party receiving the securities from the officer of the corporation knew they belonged to the corporation issuing them (that they were then in its

treasury) ; and, to obtain the securities, he actively took part in the fraud perpetrated on the company. It was, of course, properly decided that, on these facts, he was not a bona fide holder.

Neither is one a bona fide holder who receives bonds or stocks from an officer of the corporation issuing them, when that officer, in the negotiation of the sale, pledge, or transfer, is exercising the functions of his office, and at the same time using the securities for his own purposes or for his own pecuniary benefit. Such cases are founded on the principle that an agent cannot lawfully act for his principal and himself in matters in which they have adverse interests, and it follows that every person dealing with an agent so acting is put on inquiry as to the agent's good faith and authority. Moores v. Citizens' National Bank (C. C.) 15 Fed. 141; Id., 111 U. S. 156, 169, 4 Sup. Ct. 345, 28 L. Ed. 385; Farrington v. South Boston R. R. Co., 150 Mass. 406, 23 N. E. 109, 5 L. R. A. 849, 15 Am. St. Rep. 222. The principles of these cases have no application when the officer or agent is acting for himself, and not even apparently acting in any manner for his principal or corporation.

There are cases cited in the briefs, relating to the transfer of fraudulent certificates of stock, which show on their face that they are transferable only on the books of the company, in which the purchaser failed to make inquiry at the company's office. Such cases are clearly distinguishable from the case at bar, which relates to the transfer of bonds payable to bearer, issued to pass from hand to hand like a bank bill. Long Island Loan & Trust Company v. Columbus, C. & I. C. Ry. Co. (C. C.) 65 Fed. 455.

The bonds pledged were payable to bearer. They were certified by the trustee as duly issued. Those who pledged the bonds were claiming to be owners of them, and in pledging them, although they were directors of the corporation that issued the bonds, they were exercising no functions of their office; they acted personally, not officially. Under the circumstances, I do not think that the knowledge of the claimant bank that Knight and Fyans were directors charged it with notice of any infirmity, if such infirmity existed, in the title of the pledgors.

The record shows that the dividends that will go on the $25,000 of bonds will not pay the amount due the bank, and will not equal the amount for which the bonds were transferred by Humes to Knight, together with the amount received on them by the Madison Manufacturing Company. No question, therefore, can arise as to any excess of dividends over these sums.

A decree will be entered conforming to this opinion, sustaining and allowing the exceptions of the claimant bank to the special master's report.

NOTE.—Since the foregoing opinion was written, the Circuit Court of Appeals for the Fifth Circuit has had occasion, in the case of Union National Bank v. Neill, 149 Fed. 711, to state and follow the rule prevailing in the federal courts as to the diligence required of a purchaser of negotiable paper before maturity, and as to what consti-

tutes notice to the purchaser of an infirmity in such paper in the hands of the prior holder. In that connection the recent case of First National Bank v. Moore (C. C. A.) 148 Fed. 953, is also referred to.

---

## THE DISA.

### (District Court, S. D. New York. April 12, 1907.)

**1. SHIPPING—CHARTER HIRE—TIME OF REDELIVERY.**

Where, at the time of an oral charter of a steamer to carry a cargo of fruit at a monthly hire, she had fittings for the cargo which had been left therein by a former charterer, and which, with some additions, were also left by the later charterer when she was redelivered, the owner is not entitled to recover hire thereafter during the time of a dispute as to the duty of the charterer to remove such fittings.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 194.]

**2. SAME—BREAKDOWN OF MACHINERY—LIABILITY FOR INCIDENTAL LOSS TO CHARTERER.**

Under a charter of a steamer to proceed to Cuba for a cargo of fruit, which exempted the owner from liability due to any accident to the machinery, his failure to promptly notify the charterer of a breakdown at sea which delayed arrival at the port of loading for several days, did not render him liable for a loss of bananas which had been cut in anticipation of her earlier arrival; there being no provision of the charter requiring such notice.

In Admiralty.

Wheeler, Cortis & Haight, for The Disa.
Hulbert & Webb, for respondent and cross libellant.