No. 8781.

BURNHAM LOAN & INVESTMENT COMPANY *v.* SETHMAN ET AL.

1. PROMISSORY NOTE—*Holder in Due Course.* Harrell, president of the German Company, to induce defendant to purchase stock in that company, promised him that if he would make the purchase, executing his promissory note for the amount, due in sixty days, he should be elected treasurer of the company,

and that the company would retain his note, and renew it from time to time, until his salary as treasurer should discharge the amount due thereof.

Sethman, relying upon this promise, executed his note in ordinary form, and delivered it to Harrell, but he was not elected treasurer of the company, and never received the stock. The German Company, by Harrell as president, presently indorsed the note in blank, and delivered to Mitchell, treasurer of that company, and Mitchell thereupon borrowed of plaintiff the sum of $3,000, executing his own note therefor at ninety days, and pledging defendant's note, then still immature, as collateral security. The $3,000 was borrowed to pay commissions on the sale of stock to defendant, and was applied to that purpose, though Mitchell, who was entitled to a share of it, in fact received nothing. Action of plaintiff against defendant upon his promissory note. There was no evidence that plaintiff in accepting the note had notice of any want of consideration or took the note in bad faith in fact. Judgment for defendant reversed and judgment for plaintiff ordered.

2. —— *Bad Faith Defined.* Plaintiff's knowledge, at the time of accepting the note, that Mitchell was treasurer of the payee, inasmuch as in pledging the note he exercised no function of that office, held no evidence of bad faith on the part of plaintiff, and insufficient to warrant any inference thereof.

3. —— *Duty of Inquiry.* One offering negotiable paper fair upon its face, and not due, is under no duty to inquire of the maker as to its validity.

Nor was plaintiff in this case under duty to inquire of the directors of the German Company, as to the right of Mitchell to dispose of the note.

*Error to Denver District Court, Hon. James H. Teller, Judge.*

Mr. W. E. RICHARDS, for plaintiff in error.

Mr. MILTON SMITH, Mr. CHARLES R. BROCK, Mr. WILLIAM H. FERGUSON and Mr. JOHN P. AKOLD, for defendant in error.     Garrigues, J.

*Statement.*

PLAINTIFF below, The Burnham Loan & Investment Company, plaintiff in error, brought this suit, as pledgee, against George H. Sethman, on his promissory note for

$10,002.00, given to the German-American Indemnity Company, in payment for stock, and negotiated and delivered to plaintiff, by one S. N. Mitchell, as collateral security to his note for $3,000.00. The trial court found that plaintiff was not a holder in due course, basing its finding upon a lack of diligent inquiry amounting to bad faith, in accepting the note, and rendered judgment in favor of defendant.

Plaintiff's business was loaning money. One R. A. Ramey, who was its secretary, treasurer and general manager, and had entire charge of the business, made the loan to Mitchell which resulted in this litigation. The business of the German-American Indemnity Company, hereinafter called the Indemnity Company, was writing insurance. One E. C. Harrell was its president and general manager and the by-laws gave him the entire charge and control of all its business. Mitchell was treasurer, but in name only, his duty as such being to pay out money on the order of the president and secretary. He had nothing to do with the books and had no possession or control of the company's notes and bills receivable. He was under contract as the general stock salesman on commission. The by-laws provide that the notes and bills receivable of the company should be kept by the secretary, which office was held by one Doctor Brown. Defendant Sethman was a civil engineer for companies employing workmen, and one Harry Ramey, son of R. A. Ramey, was an insurance solicitor for the Indemnity Company, but was in no way connected with or identified with plaintiff.

March 5, 1912, Sethman went to the Indemnity Company's office in Denver and bought from Harrell, the president, 3,334 shares of the capital stock of the company at $3.00 per share, of the par value of $1.00 per share, amounting to $10,002.00, for which he made, executed and delivered to the company his promissory note, in ordinary form, payable in 60 days. Harry Ramey and one Reid were instrumental in securing Sethman as such purchaser. Harrell, as president and general manager, promised Sethman if he would buy the stock and give the company his

note for the purchase price, that it would retain possession of the note; that the company would issue him the stock, and elect him treasurer, at a salary of $2,500.00 a year; that the duties of the office would not interfere with his usual occupation; that he would not be required to meet the note at maturity, but the company would renew it from time to time, until his salary paid the amount due thereon; that the company desired the names of the various corporations with which he was associated as engineer, and wanted his influence with their workmen to induce them to take out policies of insurance. The stock was never issued to him, and he was not elected treasurer. His note was endorsed by the payee in blank, and delivered by Harrell to Mitchell, who on the 18th applied to plaintiff for a loan of $3,000, and offered the Sethman note so endorsed and in his possession, together with 3,000 shares of the capital stock of the Indemnity Company, standing in the name of Harrell, also endorsed in blank, as collateral security for the loan. Mitchell told Ramey that the note was assigned to him (Mitchell) on account of commissions the company owed him on stock sales. Ramey went to the company's office and inquired of Harrell regarding his authority as president to make the endorsement, and was shown the following by-law, passed when Harrell was elected president, under which the company had been working some two years:

"Duties of President. It shall be the duty of the president to preside at all meetings of the board of directors, to sign all deeds, bonds, certificates of stocks, checks, and documents of any description of the company, and to have general supervision of all meetings, either stockholders' or directors' meetings. It shall be his duty to call all meetings, either regular or special, and the call shall be made in accordance with the by-laws. It shall be his duty to secure the services and fix the remuneration of agents, employes and assistant officers for the general promotion and welfare of the company, and shall have entire charge of the affairs of the company. A suitable compensation, to be determined

by the directors, shall be allowed the president for his services. Motion duly seconded by Mr. Probst and unanimously adopted and the by-laws so amended."

Harrell also told Ramey the note was given for stock sold and delivered to Sethman. After making further inquiry, plaintiff made the loan, and paid out the money on Mitchell's order, taking his note therefor, payable in 90 days, and Mitchell delivered to plaintiff the Sethman note as collateral. While plaintiff made a personal loan to Mitchell, in fact, the money was borrowed to pay agents' advance commission on the sale of the stock to Sethman, for which the note was given, and was used for that purpose. The company agreed to pay its agents 30 per cent commission on the sale of stock, and required them to give 10 per cent of this to Mitchell, as general agent, and he, under some agreement, was to divide this with Harrell. The commission on the Sethman sale was $3,000.00, the amount of the Mitchell loan. Reid and young Ramey were the agents instrumental in producing the purchaser, and on this account each received one-third of the proceeds of the Mitchell loan; the remainder, under their agreement, should have been divided between Harrell and Mitchell, but Harrell overlooked this detail, and Mitchell, as a fact, received nothing out of the loan, though it was made in his individual name. So while ostensibly, and in fact, so far as plaintiff knew at the time, it made a personal loan to Mitchell, the company received and used the money to pay these agents.

There is no evidence plaintiff had knowledge of any defense the maker had to the note, and no evidence that it had actual knowledge of any defect in Mitchell's title. After Mitchell failed to pay his note, plaintiff had several interviews with Sethman about the payment of his note, and finally Sethman declared that it had been obtained by fraud; that there was a want of consideration, and that he would pay nothing upon it. Thereupon this action was instituted. *The Pleadings.*

The complaint alleges that March 5, 1912, Sethman made and delivered his promissory note for $10,002.00 to the Indemnity Company, payable 60 days after date; that the Indemnity Company indorsed in blank, negotiated and delivered it to Mitchell, and on March 18, 1912, for value, he negotiated and delivered it to plaintiff, who is the holder in due course. The answer pleads failure and want of consideration, of which, it is alleged, plaintiff had notice, and also alleges a defect in the title of the person negotiating it to plaintiff, of which, it is alleged, it had notice; that plaintiff did not take the note in good faith and is not a holder in due course; that plaintiff, in making the loan, advanced the money to the Indemnity Company, to be used in paying obligations to its agents. The replication denies knowledge of any defense the maker had to the note; denies knowledge of any defect in the title of the person negotiating it; denies that plaintiff advanced the money to the Indemnity Company, and alleges as the transaction: That March 18, 1912, plaintiff loaned Mitchell $3,000.00; that he made and delivered to it his promissory note therefor, payable in 90 days, and as security deposited with plaintiff the Sethman note, and prays that its recovery be limited to the amount due on the Mitchell note. July 20, 1914, after judgment entered and after the term of court had expired, without notice to plaintiff, and without leave of court first had and obtained, defendant filed an answer, in which it is alleged that Mitchell had no authority to pledge the note; that he pledged it to plaintiff as collateral security for a loan plaintiff made to him personally, at a time when plaintiff knew he was treasurer of the company, and knew, or should have known, that he had no authority to pledge company property as security for his personal loan, and that his title was therefore defective.

*The Statute.*

Our commercial code, passed in 1897, provides:

Sec. 34. "An indorsement in blank specifies no indorsee, and an instrument so indorsed is payable to bearer, and may be negotiated by delivery."

Sec. 52. "A holder in due course is a holder who has taken the instrument under the following conditions: * * * 3. That he took it in good faith and for value. 4. That at the time it was negotiated to him he had no notice of any * * * defect in the title of the person negotiating it."

Sec. 55. "The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to fraud."

Sec. 56. "To constitute notice of * * * defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of * * * the defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Sec. 57. "A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Sec. 58. "In the hands of any holder, other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable. * * *"

Sec. 59. "Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course. But the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title."

GARRIGUES, J. (After stating the case as above.)

1. It is claimed plaintiff is not a holder in due course because: (a) It took the note with notice of the defense the maker had, of want or failure of consideration. (b) It did not take the note in good faith. (c) That plaintiff took the

note with notice of defect in the title of the person negotiating it—Mitchell.

The defenses interposed are controlled entirely by the statute. There is not a particle of evidence that plaintiff had notice of want or failure of consideration; neither is there any evidence that it took the note in bad faith in fact. Bad means evil, something vicious. Bad faith in fact, or *mala fides*, is the opposite of good faith, and consists in guilty knowledge, or willful ignorance, showing a vicious or evil mind, evidence of which is totally lacking in this case. The evidence shows that plaintiff, in making this loan and accepting the collateral, acted in the utmost good faith. There is no evidence to the contrary. The court made no finding of actual bad faith, or actual knowledge of a defective title, or that plaintiff possessed knowledge of any defense the maker had to the note; if it had, its action in doing so would have been arbitrary, unwarranted and unsupported by any evidence, or the result of a mistake.

Plaintiff must be a holder in due course, and paragraph 4, section 52, is controlling as to when one is such a holder. If it took the instrument with actual or constructive notice of defect in the title of the person negotiating it, it is not a holder in due course. The statute removes any uncertainty or doubt as to what constitutes a defective title, and also what shall be notice thereof. Section 55 defines a defective title. We will assume for the purpose of this branch of the case that Mitchell negotiated the note under circumstances amounting to a fraud upon the Indemnity Company, which made his title defective. But did plaintiff have notice of such defect? Section 56 provides that to constitute notice of such defective title, the person to whom the note is negotiated must have actual knowledge of such defect, or knowledge of *such facts* that his action in taking the instrument amounted to bad faith. There is no evidence of actual knowledge, and no such finding was made by the court. If plaintiff had no actual knowledge, but had knowledge of "such facts" that its action in taking the note amounted to bad faith, it had constructive notice of Mitch-

ell's defective title, and under the statute would not be a holder in due course, of which defendant could take advantage.

It is claimed by defendant that Mitchell, in negotiating the security, was appropriating property of the company to his own personal use. If true, this would amount to a fraud on the company, and his title, under section 55, would be defective. Assuming it was defective, it is as necessary that plaintiff should have notice of such defect as it is that the title should be defective. It is claimed plaintiff had knowledge of *such facts* that its action in taking the instrument amounted to bad faith, which constituted notice of the defective title. What were the facts proven on the trial, of which plaintiff had knowledge, that made its action in taking the note amount to bad faith? The claim is: Because plaintiff knew that Mitchell was treasurer of the Indemnity Company. Mitchell exercised no function of this office in pledging the note. Bad faith is an inference drawn from the fact that he was treasurer of the company, but the evidence must warrant such an inference. The mere knowledge that Mitchell was treasurer was not knowledge of "such facts" under the undisputed evidence of this case as would justify the deduction that plaintiff's action in taking the note amounted to bad faith, and the court was not warranted either, as a matter of law or fact, in making such deduction. Whether its action in taking the note with such knowledge would warrant the inference of bad faith under section 56 is a question of law. Where, as here, there is no conflict in the evidence regarding knowledge of *such facts*, whether plaintiff's action in accepting the security amounted to bad faith, rests upon a legal inference drawn from the knowledge that Mitchell was treasurer. Such knowledge does not constitute bad faith in fact, and it would be idle to contend that it constituted bad faith as a matter of law, or that it warranted, in this case, the inference of bad faith. The finding of the court was nothing more than a deduction as to the effect of the knowledge of "such facts," and this is a question of law. No doubt an

inference of bad faith may be drawn, if warranted, as a deduction by the court or jury, and where there is sufficient evidence to warrant or justify it, the inference when made becomes proof as a fact of bad faith, and a court of review would not interfere with the finding; but there must be sufficient legal evidence to warrant such inference. There is no evidence of bad faith in fact, and because plaintiff knew that Mitchell was treasurer of the Indemnity Company was insufficient in law to warrant the inference of bad faith. *Merchants Bank v. McClelland,* 9 Colo. 608-611, 13 Pac. 723; *Coors v. German Nat. Bank,* 14 Colo. 202-206, 23 Pac. 328, 7 L. R. A. 845; *Tourtelotte v. Brown,* 1 Colo. App. 408-417, 29 Pac. 130; *Colomon v. Brodie,* 10 Colo. App. 353-359-360, 50 Pac. 1045; *Wedge Co. v. Denver Bank,* 19 Colo. App. 182-189, 73 Pac. 873; *German-American Co. v. State Bank,* 26 Colo. App. 242, 142 Pac. 189; *Montvale v. Peoples Bank,* 74 N. J. L. 464, 67 Atl. 67; *Fillebrown v. Hayward,* 190 Mass., 472-480, 77 N. E. 45; *Rockville Bank v. Citizens Co.,* 72 Conn. 576-582-583, 45 Atl. 361; *Kaiser v. U. S. Bank,* 99 Ga. 258, 25 S. E. 620; *Doe v. N. W. C. & T. Co.,* 78 Fed. 62, 68-69; *Kaiser v. First Nat. Bank,* 78 Fed., 281-284, 24 C. C. 88; *Farmers Co. v. Madison Co.,* 153 Fed. 310-319.

2. That the rule of law contended for by defendant does not prevail in this state is shown by the citations. We have adopted and are following the federal rule in this regard. But even if the rule relied upon by defendant prevailed here, the facts in this case do not bring it within the rule. In the class of cases supporting the rule contended for, the party accepting the security from the company officer, for a personal loan, could see upon the face of the transaction that the officer, by exercising the function of his office, was at the same time using the security belonging to the company for his own personal benefit; that is, that it was in connection with, or by his act, as an officer, that he was appropriating company property to his own use. Using this case as an illustration, it would be the same as though Harrell, in his official capacity as

president, endorsed the company's name on the Sethman note, and offered it to plaintiff so endorsed as security in connection with his application for a personal loan, in which event plaintiff could see that the president and general manager, with power to endorse the company's name, was exercising a function of his office and at the same time using the security endorsed by him for his individual purpose. This case is very different. The note had been regularly endorsed by the company, by its president, authorized so to do by the by-laws, and delivered to Mitchell. Plaintiff found Mitchell in the possession of such endorsed paper. Mitchell did not exercise any official act in negotiating and delivering the note, and had nothing to do with the endorsement. It had already been endorsed by the company and delivered to him. Upon inquiry as to the president's right to endorse the company's name upon the note, plaintiff was shown the by-law giving the president entire control of the business affairs and management of the corporation, and was informed that the note had been delivered to Mitchell on account of commissions on the sale of stock. Mitchell exercised no function of his office as treasurer in connection with the loan.

3. The court based plaintiff's knowledge of *such facts* that its action in taking the note amounted to bad faith, constituting notice of Mitchell's defective title, upon plaintiff's lack of diligence in making inquiry as to Mitchell's right to use the note; that is, that plaintiff was guilty of negligence in not making diligent inquiry, which amounted to bad faith under section 56, constituting such notice. Plaintiff was under no obligation to inquire of the maker of the note; if so, no one could ever purchase negotiable paper, and be a holder in due course, without first making inquiry of the maker. Inquiry, if necessary here, was as to the title of the person negotiating the instrument. The court found plaintiff failed to use due diligence in making such inquiry. This was in effect a finding of knowledge of facts amounting to bad faith in taking the instrument, constituting notice of such defective title. There is no con-

flict in the evidence in this regard as to what was or was not done. Plaintiff did make inquiry. It went to the office of the company, where it found the president and general manager, and upon inquiry was shown the by-law passed by the board, which gave the president the entire charge and management of the affairs of the company. This showed ample authority to endorse the company's name upon the note, and there was evidence that Harrell had been exercising such authority. There is no evidence or absence of evidence upon which the court could properly base a finding of lack of diligence, unless it be that plaintiff failed to inquire of the board of directors. The court seems to have entertained the idea that it was plaintiff's duty to inquire of the board of directors as to Mitchell's right to use the endorsed note. We know of no such duty, and we think under the evidence in this case that plaintiff was charged with no such inquiry. Where the evidence is not conflicting in this particular and there is insufficient evidence to warrant a finding of lack of diligence in making such inquiry, a finding that plaintiff's action in taking the note amounted to bad faith can not be sustained as a matter of law.

4. Defendant thought he was getting 3,334 shares of valuable stock for practically nothing. Instead of protecting himself in such adventure, he gave an ordinary 60-day negotiable note, with interest from date, and shortly thereafter the payee endorsed it in blank, negotiated and delivered it to Mitchell, who applied to plaintiff for a loan and negotiated and delivered it to plaintiff as security. The evidence shows without conflict that plaintiff took the note in good faith for a valuable consideration, before maturity, without notice of any defense the maker had, and without notice of any defect in the title of the person negotiating it. Defendant could easily have protected himself by a proper wording of the note. Instead of this, he made it possible for his negotiable paper to pass into the hands of an innocent purchaser, and he, instead of plaintiff, should suffer the loss.

The judgment is reversed and the cause remanded to the lower court, with directions to enter a judgment in favor of plaintiff in accordance with the views herein expressed.

Reversed and remanded with directions.

Decision *en banc*.

Mr. Justice Teller not participating.

Chief Justice Hill dissents.

Decided February 4, A. D. 1918.   Rehearing denied April 1, A. D. 1918.