2002 OK 14

Phyllis MYERS and Steve Myers, Plaintiffs–Appellants,

v.

Karen H. LASHLEY, Ph.D., Defendant–Appellee,

Rhonda Lynn Thomason, Gilbert Medical Center, Inc., An Oklahoma Professional Corporation, Defendants.

No. 96,102.

Supreme Court of Oklahoma.

Feb. 26, 2002.

As Amended March 20, 2002.

Garvin A. Isaacs, Nancy A. Zerr, Garvin A. Isaacs, Inc., Oklahoma City, OK, for Appellants.

Robert T. Goolsby, Goolsby, Olson & Proctor, Oklahoma City, OK, for Appellee.

Laura Haag McConnell, Hartzog, Conger, Cason & Neville, Oklahoma City, OK, for Guardian Ad Litem.[1]

OPALA, J.

¶ 1 The sole issue presented by this appeal is whether the evidentiary materials demonstrate a nonactionable claim because the defendant-psychologist's conduct in contest is within the range of her qualified statutory privilege [2] for good-faith reporting of child abuse? We answer in the affirmative.

## I

### THE ANATOMY OF LITIGATION

¶ 2 This is an appeal from summary judgment for the defendant Karen H. Lashley, Ph.D. [Dr. Lashley], in an action by Steve Myers [father] and his mother, Phyllis Myers [grandmother] [both plaintiffs named Myers will be referred to as plaintiffs or Myers (in the plural) ], to recover for harm occasioned by allegedly substandard evaluative techniques in the treatment of Steve Myers' children (M.D.M. and Melanie Myers, who are neither parties to this appeal nor to the litigation below), which resulted in Myers being wrongly identified as child abusers.

¶ 3 Steve Myers and Rhonda Thomason were married 7 May 1977. The three children born of the marriage are Melissa, Melanie and M.D.M. The parents divorced 11 December 1992 and the custody of their old-

---

1. Identified here are only those counsel whose names appear on the briefs in this court.

2. The child abuse reporting laws in force in January 1994 when the defendant-psychologist reported the sexual abuse of the plaintiff's daughter (Melanie) were in 21 O.S.1991 §§ 843–848. *Without any substantive change* these statutes were carried from Title 21 to Title 10 by legislation enacted in 1995 (Oklahoma Child Abuse Reporting and Prevention Act, 10 O.S.Supp.2001 § 7101 *et seq*). For the terms of the earlier (pre–1995) statutory *reporting privilege* see 21 O.S.1991 § 847 [*now* 10 O.S.Supp.2000 § 7105 ], *infra* note 21.

est daughter, Melissa (then 14 years), went to the father. The mother received custody of the two younger daughters, Melanie (11 years) and M.D.M. (6 years). During the ten-year period between the filing of the divorce petition and the prosecution of this lawsuit the father and mother have continued to do forensic battle over various domestic problems.[3]

¶ 4 In November 1993 the mother took Melanie and M.D.M. to the Gilbert Medical Center. There Dr. R. diagnosed Melanie as being depressed and fatigued. He referred her and M.D.M. to Dr. Karen Lashley [Lashley], a licensed clinical psychologist,[4] who then practiced at the clinic. According to Dr. Lashley's notes, Dr. R based his referral of Melanie on concerns about "anxiety, depression and possible abuse." Dr. Lashley's clinical notes, taken during a 30 January 1994 therapy session, indicate that Melanie made allegations about her father's sexual abuse. M.D.M. also revealed sexual abuse by her paternal grandmother, Phyllis Myers. Dr. Lashley notified the Oklahoma Department of Human Services [DHS] in January 1994 about receiving information of Melanie's

sexual abuse.[5] Rhonda Thomason reported the same allegations to the police department.[6] After an extensive investigation, *the police declined to press charges against Myers.*

¶ 5 On 4 January 1996 Myers brought two separate actions against Dr. Lashley, Rhonda Thomason and the Gilbert Medical Center, Inc. (consolidated as joint proceedings for discovery purposes). The plaintiffs initially pressed their claims on three theories of liability: (a) *against Rhonda Thomason*[7] for slander *per se* and (b) *against Rhonda Thomason, Dr. Lashley* and *the medical center* for negligent infliction of emotional distress as well as (c) for reckless and/or intentional infliction of emotional distress. Myers' *amended petitions* name Dr. Lashley as the *sole defendant*[8] and allege only *two theories of liability*[9]—professional negligence and intentional infliction of emotional distress. Dr. Lashley's answer tenders several affirmative defenses.[10] A guardian *ad litem* was appointed to represent the interest of the children.

¶ 6 Steve Myers sought damages for loss of income, loss of companionship, love and

**3.** According to the evidentiary materials, several victim protective orders, custody modifications, and contempt citations were sought.

**4.** For the Psychologists Licensing Act see 59 O.S. 1991 §§ 1351–1376.

**5.** Dr. Lashley's typed notes of *20 January 1994* state that she contacted DHS and Melanie's family lawyer about Melanie's allegations of sexual abuse. Dr. Lashley's handwritten notes of *30 January 1994* indicate that she contacted about the sexual abuse Melanie's mother, DHS, the Bethany police as well as an attorney.

**6.** The mother notified the Oklahoma City police about Melanie's allegations of sexual abuse and the Bethany police about M.D.M.'s allegations of sexual abuse.

**7.** The grandmother's original petition alleged that Rhonda had communicated to M.D.M., and to the grandmother's friends and associates, that Phyllis Myers had sexually molested M.D.M. The father's original petition alleged that Rhonda had communicated to his three daughters and their friends as well as to his friends and associates that he had sexually molested his three daughters and that he continued to be a threat to the daughters as well as to other children.

**8.** The record for this appeal reflects that the Gilbert Medical Center, Inc. was dismissed with

prejudice by order entered 9 September 1999. According to the trial court's 9 November 2000 order, Gilbert Medical Center and Rhonda Thomason were declared by stipulation to be no longer parties defendant in this action. Although the latter order is not in the record for appeal, it was included in the appendix to Dr. Lashley's 22 November 2000 application for a writ of mandamus, styled on this court's docket as *Dr. Karen H. Lashley v. The Honorable Nancy L. Coats*, No. 95,537. An appellate court may take judicial notice of its own records in litigation interconnected with a cause before it. *Matter of C.A.D.*, 1992 OK 89, 839 P.2d 165, 169 n. 10; *Reeves v. Agee*, 1989 OK 25, 769 P.2d 745, 756 n. 40.

**9.** The record includes an *unstamped* copy of the first amended petition. *Item 3 on the Index to Contents of Record.* The court clerk's certificate informs us that the documents listed on the index "are true and correct copies of the originals on file in the court clerk's office in the consolidated case."

**10.** Dr. Lashley alleges as affirmative defenses: negligence of third parties over whom she had no control, Myers' contributory and comparative negligence, intentional misconduct of Myers and/or of third parties over whom she had no control, lack of a duty to Myers, and **her law-imposed duty to report which protects her from liability.**

affection of his daughters, mental anguish and emotional distress (suffered from being called a child molester); Phyllis Myers for harm to her reputation, for lost income from the day care business that she and her son owned, medical expense, mental anguish and emotional distress.

■ ¶ 7 The trial court *initially* denied Dr. Lashley's quest for summary relief. A year later it declared (by order entered 9 March 2001) Myers' claim not actionable. Summary judgment went to Dr. Lashley.[11] Myers' joint appeal stands retained for disposition by this court. **Today we affirm the nisi prius judgment on a theory different from that on which it was rested below** (lack of duty to the plaintiffs). Although we let the *judgment* for Dr. Lashley stand, we need not examine it on the ground assigned by the trial court. When supported by the record, a legally correct nisi prius judgment must be affirmed although it was anchored to a theory different from that on which it comes to be tested on appellate review.[12]

### The Mid–Trial Appellate Controversy

¶ 8 In launching her defense below Dr. Lashley had perceived herself impeded in the

11. The trial court found that (a) as a matter of law Dr. Lashley owes no duty to Myers and (b) the claim is not actionable under state law when measured in light of *Paulson v. Sternlof,* 2000 OK CIV APP 128, 15 P.3d 981; *Zaharias v. Gammill,* 1992 OK 149, 844 P.2d 137 and 10 O.S.Supp. 2000 § 7105.

12. *Akin v. Missouri Pacific R. Co.,* 1998 OK 102, ¶ 35, 977 P.2d 1040, 1054; *Bivins v. State ex rel. Oklahoma Memorial Hosp.,* 1996 OK 5, ¶ 22, n. 40, 917 P.2d 456, 465, n. 40; *Matter of Estate of Maheras,* 1995 OK 40, ¶ 7, 897 P.2d 268, 272 n. 6; *Wright v. Grove Sun Newspaper Corp., Inc.,* 1994 OK 37, ¶ 18, 873 P.2d 983, 992.

13. In the course of the original proceeding in this court Dr. Lashley sought to compel the trial judge (1) to order Melanie Myers and M.D.M. to provide medical authorization; or to issue an order waiving Melanie's and M.D.M.'s medical privilege and (2) to compel the guardian *ad litem* (of M.D.M. and former guardian *ad litem* of Melanie Myers) to provide pertinent testimony and records. In the event her request were denied, Dr. Lashley sought an order that would: (1) compel the trial court to bifurcate the Myers' trials; and/or (2) grant her relief from Judge Amick's orders of 26 July 1996 (by which he

discovery of testimony and records relating to her treatment of the girls and in her access to certain medical information about the girls' mental health, which are now under control of other physicians. She sought a writ (of mandamus) to compel the trial judge to aid her in these efforts.[13] By its January 16, 2001 order this court took original cognizance of the mandamus case and stayed all further proceedings here until the trial court had decided whether Myers had an actionable claim and if so, whether Dr. Lashley would be impeded by legal barriers in pressing her chosen defense theories.[14] Because the reason for the writ stood removed by the summary judgment later entered below in Dr. Lashley's favor, the original proceeding was eventually terminated for mootness.

## II

## THEORIES AND CONTENTIONS OF THE PARTIES

### A.

### *Theories of Myers' Claim Which Stood under Consideration in the Summary Process*

¶ 9 Myers argue that a mental health care professional owes a duty to a parent (or

denied her motion for order requiring limited waiver of psychologist-patient privilege) and of 11 June 1998 (overruling motion to compel Dr. Lashley to produce interrogatories and documents, by which Judge Amick reiterated his previously declared position that the psychologist-patient privilege has not been waived).

14. This court's 16 January 2001 order in Dr. Lashley's original proceeding states in pertinent part:

Original jurisdiction is assumed; all proceedings in this court are stayed until the parties have secured from the trial court, through appropriate procedural means, the following determinations:

(1) Whether the plaintiffs' claim is actionable under the laws of this State when measured in light of *Paulson v. Sternlof,* 2000 OK CIV APP 128, [15] P.3d [981]; *Zaharias v. Gammill,* 1992 OK 149, 844 P.2d 137; and 10 O.S.2000 Supp. § 7105; see also *Bryson v. Tillinghast,* 1988 OK 6, 749 P.2d 110; and

(2) If the preceding question be answered in the affirmative, then whether the defendant below is effectively precluded from advancing her critical theories of defense by legal barriers that operate to render her virtually defenseless.

grandparent) not to misdiagnose negligently a child's condition, if that misdiagnosis should lead to a false accusation of sexual abuse. They urge that their claim is actionable on the theory that the defendant's *negligent therapy and psychiatric care* brought about the *implanting* and *reinforcing* of false memories (of sexual abuse) in Steve Myers' daughters. By their *other* theory of liability, Dr. Lashley is alleged to have *intentionally inflicted emotional distress* upon them "by planting false memories in the minds of the children and making false reports of sexual abuse." Myers insist their claim is *not rested on the defendant's submission of a report compelled by Oklahoma's child abuse reporting laws,*[15] but rather *upon negligent misdiagnosis of Myers' children* and the *resultant harm to them* from therapy-induced suggestions of sexual abuse.

### B.

### *Dr. Lashley's Theories of Defense Under Nisi Prius Consideration in the Summary Process*

¶ 10 Dr. Lashley argues that in third-party suits (those that are not brought by a patient) she is protected from liability by the shield afforded her through the statutory reporting privilege.[16] According to her,

15. 21 O.S.1991 §§ 843–848 [*now* 10 O.S.Supp. 2000 § 7101 et seq.].

16. For the statutory reporting privilege Dr. Lashley relies on the provisions of 10 O.S.Supp.2000 § 7105. For the terms of the earlier (pre–1995) statute, see 21 O.S.1991 § 847, *infra* note 21.

17. The terms of 21 O.S.Supp.1992 § 845 (*now* 10 O.S.Supp.2001 § 7102) provided in pertinent part:
    A. It is the policy of this state to provide for the protection of children who have had physical injury inflicted upon them and who, in the absence of appropriate reports concerning their condition and circumstances, may be further threatened by the conduct of persons responsible for the care and protection of such children.
    B. As used in Sections 846 and 848 of this title:
    1. "Abuse and neglect" means harm or threatened harm to a child's health or welfare by a person responsible for the child's health or welfare;
    2. "Harm or threatened harm to a child's health or welfare" includes but is not limited

when a psychologist is under compulsion to report the revealed (or discovered) information of child abuse, that professional's actions in the report's submission stand protected by the Act.

### III

### POST-REPORTING HARM TO THE PLAINTIFFS, WHICH WAS OCCASIONED BY DR. LASHLEY'S ALLEGEDLY IMPROPER EVALUATIVE TECHNIQUES, FALLS WITHIN THE AMBIT OF THE REPORTING STATUTE'S QUALIFIED PRIVILEGE

### A.

### *Oklahoma's Child Abuse Reporting Laws*

¶ 11 Oklahoma's child abuse reporting laws express the State's strong public interest in protecting children from abuse by the policy of mandatory reporting of *actual* and *suspected* child abuse or neglect to appropriate authorities and agencies.[17] The statutory scheme *imposes upon all health care professionals* (teachers as well as all other persons) an obligation to report in good faith all suspected instances of child abuse to the Department of Human Services.[18] No privi-

to nonaccidental physical or mental injury; sexual abuse, sexual exploitation, . . .

18. The pertinent terms of 21 O.S.Supp.1993 § 846 [*now* 10 O.S.Supp.2000 § 7103] were:
    A. 1. *Every:*
    a. physician or surgeon, including doctors of medicine and dentistry, licensed osteopathic physicians, residents and interns, examining, attending or treating a child under the age of eighteen (18) years,
    b. registered nurse examining, attending or treating such a child in the absence of a physician or surgeon,
    c. teacher of any child under the age of eighteen (18) years, and
    d. *other person*
    *having reason to believe that a child under the age of eighteen (18) years has had physical injury or injuries inflicted upon him by other than accidental means where the injury appears to have been caused as a result of physical abuse, sexual abuse, or neglect, shall report the matter promptly to the county office of the Department of Human Services in the county wherein the suspected injury occurred.*

lege or contract will relieve any person from the legally mandated reporting requirement.[19] The knowing and willful failure to report child abuse (or the making of a false report) is a misdemeanor.[20] Any one **acting in good faith** and **exercising due care** in reporting child abuse has "immunity from any liability, civil or criminal, that might otherwise be incurred." [21]

■■■■ ¶ 12 There is neither ambiguity in, nor conflict between, the various terms of the statutory reporting laws. Their legislative intent can easily be divined from the plain language of the statutes.[22]

## B.

### *The Statute-conferred Qualified Reporting Privilege Invoked By Dr. Lashley*

■■ ¶ 13 The statute-conferred privilege [23] is not aimed at shielding the professional from any one identified theory of liability. Rather, it is the *harm that may flow from the reporting* which is made irredressable.[24] The **act of reporting** and the **consequences** of a licensed clinical psychologist's lawful compliance with the reporting statute **lie at the very base of the privilege** conferred. When reporting constitutes the instrument through which the damage is inflicted, as it clearly does in this case,[25] it matters not what type of harm flows from reporting or what common-law theory is invoked by those who seek recovery. The broad statutory privilege **extends across all cognizable theories of liability.** It protects **every** professional in Dr. Lashley's class from *any* effort by those who seek to recover for harm occasioned by or through the **act of reporting. In short, the act itself** as well as all **the consequences of compelled reporting** stand shielded by the law's privi-

* * *

B. It shall be a *misdemeanor* for any person to knowingly and willfully fail to promptly report any incident as provided in this section. . . .
(emphasis supplied).

**19.** 21 O.S.1991 § 848 [*now* 10 O.S. Supp.2000 § 7103 (A)(3)].

**20.** 21 O.S.Supp.1993 § 846 (B) [*now* 10 O.S.Supp.2000 § 7103 (C)(D)], *supra* note 18.

**21.** The pertinent provisions of 21 O.S.1991 § 847 [*now* 10 O.S.Supp.2000 § 7105 ] were:

*Any person participating in good faith and exercising due care in the making of a report* pursuant to the provisions of Section 846 or 846.1 of this title, or any person who, in good faith and exercising due care, allows access to a child by persons authorized to investigate a report concerning the child shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed. Any such participant shall have the same immunity with respect to participation in any judicial proceeding resulting from such report.
(emphasis supplied).

**22.** When the court is called upon to determine if a statute applies to a given scenario, its analysis focuses on the intent of the legislature. *Cooper v. State ex rel. Dep't of Pub. Safety,* 1996 OK 49, ¶ 10, 917 P.2d 466, 468. The law-making body is presumed to have expressed its intent in the statute's language and to have intended what the text expresses. *TXO Production Corp. v. Okla-*

homa Corp. Comm'n, 1992 OK 39, ¶ 7, 829 P.2d 964, 969. Only where the intent cannot be ascertained from a statute's text, as it would occur when ambiguity or conflict (with other statutes) was shown to exist, may rules of statutory construction be employed. *Cooper, supra,* at ¶ 10, at 468; *TXO, supra,* at ¶ 7, at 969.

**23.** For the then-effective statutory privilege see 21 O.S.1991 § 847 [now 10 O.S.Supp.2000 § 7105 ], *supra* note 21.

**24.** *Lynn v. Shaw,* 1980 OK 179, ¶ 9, 620 P.2d 899, 901 affords an eloquent example for this case. There, the court considered the continued actionability of criminal conversation. The question presented was whether that common-law tort survived the statutory abrogation of two other torts—those of alienation of affection and of seduction. According to the teaching of *Lynn,* because criminal conversation is a necessary ingredient of, and is intertwined with, both abolished torts, it stands abrogated by implication (although it was not expressly mentioned in the statute by its name). Similarly here the statute conferring Dr. Lashley's invoked privilege does not limit its sweep to liability on any one theory, **but rather covers the harm occasioned by her obedience to the duty.**

**25.** All of the plaintiffs' harm doubtless flows from the defendant's act of reporting. This stands uncontradicted. Record, Plaintiffs' Exhibit H, Deposition of Phyllis Myers, pages 74–75, Appendix *infra* at ¶ 62. Not only does the acceptable proof fail to support the notion that substandard evaluative techniques alone produced Myers' in-

lege.[26] Whenever post-reporting harm is the object of one's recovery—and it cannot be connected to a professional's **bad-faith reporting** of abuse—it falls both explicitly and implicitly within the ambit of the law's conferred privilege.

¶ 14 Because this lawsuit does not seek vindication for injury to the children, but rather for that harm to Myers [27] which clearly *flowed as a direct consequence of the compelled reporting,* Myers' claim in contest must be regarded as one for detriment from good-faith reporting by a licensed clinical psychologist.[28] **The statutory reporting privilege is broad enough to protect Dr. Lashley from liability upon all theories of recovery for reporting-occasioned harm from submission to the authorities of a child abuse report.**[29]

¶ 15 The qualifiedly concurring justice perceives the court's characterization of the action as flawed.[30] Stripped of all excess verbiage and reduced to articulate simplicity, Myers, *without a doubt,* seek recovery—in

behalf of themselves as nonpatients—for harm sustained from Dr. Lashley's professional negligence in allegedly *using* substandard evaluative techniques for discovery of her underage patients' improper intrafamilial carnal intimacy and then *submitting* to the authorities a statutorily-required report, naming Myers as revealed participants in impermissible physical contacts with these minors. Myers, who allege harm to themselves alone,[31] **press solely for damages occasioned, directly or obliquely, by Dr. Lashley's child-abuse report.**[32] **In short, the gravamen of the tort in contest is the reporting.** Had the reporting statute not commanded Dr. Lashley to submit the information, the entire child-abuse scenario would likely have remained a private matter protected by the psychotherapist/patient relationship.[33] It was the report that lifted the silence imposed by that privilege and transformed a purely private document into public knowledge.

¶ 16 **Whether Myers' claim is malpractice proper is of no moment to today's**

jury, the law itself militates against that legal conclusion.

26. The reporting requirement does not insulate health care professionals from legally cognizable liability to their patients. It neither affects the existence of physician-patient relationship nor the duties that may flow from that status. We need not (and do not) address here the actionability of a claim for harm that flows to the children.

27. Steve Myers sought damages for "loss of income," "loss of companionship of his daughters," "mental anguish and emotional distress at being called a child molester," loss of "love and affection of his daughters" and "interference with the family relationship;" Phyllis Myers for "lost income from the ... day care business" that she and her son owned, "medical expense," "mental anguish and emotional distress," "damage to her reputation," and "loss of enjoyment of the consortium of her granddaughter" M.D.M. Rec. Tab # 6 (joint response to motion for summary judgment at pgs. 19, 24).

28. Myers would describe their claim as one for malpractice. A more accurate characterization might be one for negligent use of improper evaluative techniques in child abuse diagnosis that required a report to the authorities. The former claim would seek vindication for injury to the children, while the latter is for harm to Myers. No matter what language is used in attempting to pigeonhole the tort in contest, the hurdle to liability is the same.

29. The **qualifiedly concurring justice** calls for the court to recast its analysis with greater emphasis on negligence, but **does not suggest or show a method of overcoming the unpierced statutory privilege.**

30. The qualifiedly concurring justice **incorrectly attributes** to the court's opinion a flaw occasioned by **converting** Myers' theory of recovery from professional negligence to bad-faith reporting of child abuse. The gist of today's pronouncement is that **no matter what Myers' theory of liability,** the harm for which they seek to recover is that which resulted to them, not from Dr. Lashley's diagnosis and treatment, but from her child abuse report to the authorities. The qualifiedly concurring justice's first premise, stated in the opening paragraph of his writing, is hence flawed.

31. For Myers' damages, see *supra* note 27.

32. The qualifiedly concurring justice calls on the court to follow the nisi prius theory that rests its judgment for Dr. Lashley on her **lack of duty to a nonpatient.** We know of no rule **that either mandates** a slavish appellate adherence to the reasoning or analysis of the nisi prius court **or requires** this court to follow counsel's arguments that are not dispositive of the case. In sum, we are not frozen to theories either *advanced* in the trial court or *utilized* by the nisi prius judge.

33. For the psychotherapist/patient privilege, see *infra* note 58.

analysis.[34] The critical dispositive issue is whether assumed redressability of the claim is defeated by unpierced statutory privilege. Because unpierced privilege is here the **insurmountable** barrier to Dr. Lashley's liability, it is unnecessary for us to test the malpractice theory of actionability by nonpatients. It does not matter if Myers may, *in abstracto*, sue as a nonpatient; they cannot prevail without first piercing (avoiding or overcoming) Dr. Lashley's privilege.[35]

■ ¶ 17 The qualifiedly concurring justice invites the court to expand appellate inquiry beyond the issues the case tenders.[36] We must decline the invitation, mindful as we are of the time-honored principle that courts cannot extend their pronouncements beyond the strict framework of matters that must be resolved.[37] When issues decided extend beyond those that the case presents, a cloud of uncertainty is cast upon the excess of the appellate court's pronouncement.[38] If the court were to reach for decision the very issue which the qualifiedly concurring justice seeks to settle, its pronouncement on that issue, clearly unnecessary to the decision, would be an obiter dictum.[39]

## IV

## THE LEGAL SUFFICIENCY OF THE SUMMARY–PROCESS RECORD TO SUPPORT THE NISI PRIUS JUDGMENT

■ ¶ 18 Summary process is a procedural pretrial device for the prompt and efficient disposition of an action *sans* forensic combat. It is applied where there is no dispute as to the material facts or as to any inferences that may be drawn from undisputed facts, and the law favors the movant's claim or *liability-defeating* defense.[40] It is

---

34. It is of **no significance**, even if we were to concede (which we do not), that the privilege asserted must be analyzed solely on Myers' theory of professional negligence. **The result would be the same.** Myers know not of, and assert not, an injury to the patient but to themselves. Moreover, their own injury stems not from wrong evaluative techniques, but from the report's revelations. *The children's injury may have been proximately caused by substandard evaluative techniques* whereas *Myers' injury would be from reporting based on those techniques' results.* If harm from the consequences of reporting—Dr. Lashley's act alleged to be delictual—**is protected by privilege, what matters here is not the theory of liability, but the outer reach of the statutory privilege.**

35. Because we conclude today that whatever liability may be pressed is extinguished by the invoked statute-conferred privilege of reporting, we need not precisely define the essence of the tort Myers seek to prosecute against Dr. Lashley.

36. The qualifiedly concurring justice's call would not change the conclusion that withholds victory from Myers. A lawyer may be liable in a malpractice suit brought by a nonclient. *See Bradford Securities Processing Serv., Inc. v. Plaza Bank & Trust,* 1982 OK 96, 653 P.2d 188, 190–91 (where the court rejected the then-decades-old pronouncement by Cardozo, J., in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931), which holds that professional malpractice defendants are not liable to third parties for the breach of a duty to the client). A *Bradford* analysis focuses on whether "the conduct of an ordinarily prudent man based upon the dangers he should reasonably foresee" to the plaintiff "in view of all the circumstances of the case [is

sufficient] to bring the plaintiff within the orbit of defendant's liability." *Id.,* at ¶ 10, at 191. *That inquiry would indeed be in vain here. Dr. Lashley is clearly protected by an unpierced statutory privilege.*

37. See *Patterson v. Beall,* 2000 OK 92, ¶ 4, 19 P.3d 839, 849–50 (Opala, J., dissenting) for a warning sounded against "hyperglobal" pronouncements. "Another facet of the common law, one rooted in the Western Concept of legislative supremacy, is that precedent-issuing courts have no lawmaking power beyond the facts of the particular dispute being entertained. A legislature can issue a rule which captures, in its generality, an infinite number of future situations, but court holdings cannot extend, theoretically, beyond the precise situations being adjudicated." Richard B. Cappalli, THE AMERICAN COMMON LAW METHOD § 2.15 at page 18 [1997].

38. The common-law technique abhors the notion of an excess appellate pronouncement—one that goes beyond the issues of the case and results in obiter dictum. This principle coincides with the demands of judicial economy. Caselaw is confined to dimensions coextensive with its binding force. *Patterson, supra* note 37 at 849–50 (Opala, J., dissenting).

39. *Id.* The separate writing of the qualifiedly concurring justice would adopt as a common-law norm the very same public policy the court divines today from clearly expressed legislative will.

40. *Manley v. Brown,* 1999 OK 79, ¶ 22, 989 P.2d 448, 455–56.

not the purpose of summary process to substitute a trial by affidavit for one by jury, but rather to afford a method of summarily terminating a case (or eliminating from trial some of its issues on the merits of a claim or defense) where only questions of law remain.[41] Summary relief issues stand before us for *de novo* review. This court's scrutiny of the entire record is accomplished independently and without deference to the trial court's resolution.[42]

¶ 19 Dr. Lashley's claimed substandard professional performance rests on her use of allegedly improper evaluative techniques in the therapy sessions with the father's two minor daughters. To prevail as the summary-judgment movant, Dr. Lashley had the initial burden of showing (by proffered evidentiary material) want of at least *one material element in Myers' claim*.[43] She clearly met this burden by demonstrating that her report of sexual abuse and all the post-reporting harm to Myers stood shielded from liability by a legislatively conferred qualified reporting privilege.

■■■ ¶ 20 One need not pause to ponder even for a brief moment **before rejecting out-of-hand** the delusive suggestion that the plaintiffs are somehow legally shortchanged by today's affirmance. **Dr. Lashley's abso-**

lute defense could not be defeated by mere silence. There can be no doubt that the plaintiffs had received below the full measure of that summary process which is their constitutional due. Equally unassailable stands this pronouncement's analysis of the privilege statute's outer reach in its application to the defendant's liability-defeating defense. Once the plaintiffs were put **on notice** of Dr. Lashley's reliance on privilege, the onus [44] shifted to them to overcome its effect. It called upon them to **pierce, avoid or overcome that privilege** (either or all) by tendering acceptable evidentiary materials which would show the psychologist's conduct in contest was **outside the range of her statutory protection** [45] or their claim to be **unaffected by her immunity from liability.** Plaintiffs could have **pierced** the privilege by showing Dr. Lashley's submission in bad faith [46] of a flawed child-abuse report to the authorities. They had the same opportunity to **avoid** the legal incidence of the invoked privilege by showing that their tort claim pressed for recovery of harm entirely disconnected from the consequences of mandatory reporting. A party, who, when confronted in summary process by evidentiary material demonstrative of its adversary's absolute statutory defense against the pressed claim, does not act **to pierce, avoid or overcome** the complete

**41.** *Russell v. Bd. of County Comm'rs,* 1997 OK 80, ¶ 7, 952 P.2d 492, 497; *Gray v. Holman,* 1995 OK 118, ¶ 11, 909 P.2d 776, 781.

**42.** *Mahan v. NTC of America,* 1992 OK 8, ¶ 2, 832 P.2d 805, 808 (Opala, C.J., concurring) ("The *de novo* standard of review is utterly nondeferential because it ascribes absolutely no weight to a lower tribunal's findings."). An order that grants summary relief, in whole or in part, disposes solely of law questions. It is hence reviewable by a de novo standard. *Brown v. Nicholson,* 1997 OK 32, ¶ 5, 935 P.2d 319, 321; *Kluver v. Weatherford Hosp. Auth.,* 1993 OK 85, ¶ 14, 859 P.2d 1081, 1083 ("Issues of law are reviewable by a *de novo* standard and an appellate court claims for itself plenary independent and non-deferential authority to re-examine a trial court's legal rulings."); *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

**43.** *Manley, supra* note 40 at ¶ 24, at 456.

**44.** "*Onus probandi,*" onus for short, means the burden of proof. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1577 (1961).

**45.** *Manley, supra* note 40 at ¶ 24, at 456. A plaintiff who confronts in summary process a demonstrated absolute defense cannot save the claim from legal defeat by mere silence.

**46.** "Bad faith in fact, or *mala fides,* is the opposite of good faith, and consists in *guilty knowledge, or willful ignorance, showing a vicious or evil mind* ...." *Burnham Loan & Investment Co. v. Sethman,* 64 Colo. 189, 171 P. 884, 887 (1918) (emphasis supplied); *National Mut. Cas. Co. v. Britt,* 1950 OK 159, ¶ 10, 218 P.2d 1039, 1041 ("Bad faith is the antithesis of good faith ..."); *May's Drug Stores, Inc. v. State Tax Commission,* 242 Iowa 319, 45 N.W.2d 245, 255 (Iowa 1950)("*Bona fides* or good faith is the opposite of *mala fides* or bad faith...."). Good faith is defined by 25 O.S.1991 § 9 as "honest intention to abstain from taking any unconscientious advantage of another." Another definition of good faith appears in 12A O.S.1991 § 1–201 (19) of the Uniform Commercial Code ("Good faith means honesty in fact in the conduct or transaction concerned").

defense by appropriate probative devices, becomes indeed the architect of its own claim's demise.[47]

## A.

### *The Summary-process Record Falls Short of Providing Evidentiary Material That Would Demonstrate Bad-faith Reporting of Child Abuse*

¶ 21 Myers **utterly failed** to offer any acceptable evidentiary substitutes that would show Dr. Lashley's bad-faith report of abuse.[48] Instead of meeting the privilege head-on and piercing it by evidentiary materials that would demonstrate *mala fides*, they pretended that their most serious impediment to nisi prius victory was not Dr. Lashley's immunity. **Myers' strategy choices plainly doomed this lawsuit.**

¶ 22 Absent from the record are probative materials showing that Dr. Lashley's allegedly substandard evaluative techniques amounted to gross negligence or intentional wrongdoing from which either bad faith or even gross negligence might be inferred. Gross negligence is characterized as reckless indifference to the consequences.[49] It falls short of an intentional wrong's equivalent.[50] While gross negligence may support a punitive damages assessment,[51] it is insufficient either to bar the defense of contributory negligence or to provide a predicate for an inference of bad faith.[52]

¶ 23 Even if Myers were relying on gross negligence in Dr. Lashley's use of evaluative techniques they could not escalate their claim against her to a willful tort from which bad faith could be inferred. While their evidentiary materials might be sufficient to show professional negligence in the use of substandard evaluative techniques, we are constrained to hold that Myers' probative substitutes neither support an inference of bad faith nor rise to the level required to demonstrate Dr. Lashley's willful tort.[53] The element of scienter[54]—that of guilty knowledge—is an indispensable ingredient in the

**47.** *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 58 (1991)("If a qualified privilege exists, the burden is on the plaintiff to prove that the privilege was abused") (citing Prosser on Torts § 115, at 835). *McAndrew v. Scranton Republican Pub. Co.,* 364 Pa. 504, 72 A.2d 780, 785 (1950) (if the defendant invokes a privilege as a liability-defeating defense, he bears the initial burden to establish the existence of the privilege; once the defendant meets that burden it shifts to the plaintiff to demonstrate that the privilege has been abused) (citing Prosser on Torts, p. 851); *Catrone v. Thoroughbred Racing Associations of North America, Inc.,* 727 F.Supp. 717, 725 (D.Mass.1989) ("Once the defendants have met their burden of showing a qualified privilege exists, ... the burden shifts to the plaintiff to show the defendants abused their privilege. If defendants are entitled to a privilege and have not abused it, ... the defendants are entitled to judgment as a matter of law".).

**48.** For Myers' evidentiary material see Exhibits A and B *infra* at ¶¶ 55, 56.

**49.** *Wootan v. Shaw,* 1951 OK 307, 237 P.2d 442, 444.

**50.** *Graham v. Keuchel,* 1993 OK 6, 847 P.2d 342, 362. Contributory negligence is at common law a defense against ordinary negligence, but not against gross negligence or willful or wanton misconduct. *Id.* at ¶ 46, at 361. *Graham* teaches that gross negligence is placed under the same rubric as ordinary negligence for the purpose of

allowing the jury's comparison of the parties' responsibility for the total harm, but that the "same apportionment of fault into percentage figures becomes impermissible once a defendant's behavior has been established as willful and wanton misconduct. While 'ordinary' and 'gross' negligence differ in degree, 'negligence' and 'willful and wanton misconduct' differ in kind." *Id. at* ¶ 49, at 362. The court declined in *Graham* to "read into our comparative negligence regime an abrogation of the common law's dichotomous division of actionable tortious conduct into (1) negligence, ordinary or gross, and (2) willful acts that result in intended or unintended harm." *Id.*

**51.** *Id.*

**52.** *Graham, supra* note 50, at ¶¶ 45–49 at 361–362; *National Mut. Cas. Co., supra* note 46 at 1041; *Burnham Loan, supra* note 46 at 887; *May's Drug Stores, supra* note 46 at 255.

**53.** This court is powerless to lower the barrier for piercing the privilege from its statutory bad-faith formula to some less stringent requirement. While the standard may appear to be too high, the governing policy is not for judicial rethinking but for the legislature.

**54.** In civil law the element of "prior knowledge" is not always tantamount to willfulness of conduct. Willfulness stems from "guilty knowledge" which is synonymous with "culpable knowledge" or "scienter." *State ex rel. Oklahoma Bar Ass'n*

pattern of proof required to show lack of good faith. **It is *utterly* absent here.**

## B.

***The Notion That Myers' Alleged Harm from Dr. Lashley's Substandard Evaluative Techniques Was Disconnected from the Consequences Of Mandatory Reporting Lacks Support in the Record***

¶ 24 **Myers had the probative burden to demonstrate** by responsive evidentiary material that they were harmed by Dr. Lashley's allegedly substandard evaluative techniques **in advance of** the report's re-

lease. There is no such showing in the summary-process record.

¶ 25 The mother had been given the "exclusive care, custody and control" of Melanie and M.D.M.[55] By the terms of the decree, hers was the sole power to consent to the children's treatment.[56] Because the excluded noncustodial parent is not in privity with the psychotherapist/patient relationship,[57] the statutory psychotherapist/patient privilege [58] could not be lifted by Steve Myers except upon his request for the health-related information.[59]

¶ 26 There is no showing here that Dr. Lashley released the medical report to the

---

*v. Eakin*, 1995 OK 106, 914 P.2d 644, 650 n. 22; *Dayton Hudson Corporation v. American Mutual Liability Insurance Company*, 1980 OK 193, 621 P.2d 1155, 1161; *In re Initiative Petition 272, State Question 409*, 1963 OK 285, 388 P.2d 290, 293.

55. 11 December 1992 divorce decree. The trial court's authority to provide for a minor's medical care is set out in the provisions of 43 O.S.1991(1) § 112. Its pertinent terms provide:

> A petition or cross-petition for a divorce, legal separation, or annulment must state whether or not the parties have minor children of the marriage. If there are minor children of the marriage, the court:
> 1. Shall make provision for guardianship, custody, *medical care*, support and education of the children;
> (emphasis supplied).

56. For the legislature's recognition of the ***custodial parent's exclusive right to consent to treatment***, see the terms of 10 O.S.1991 § 170.1. Coextensive with that power is the authority to monitor the treatment and be informed of its progress. The terms of § 170.1 provide in pertinent part:

> Either parent, if both parents have legal custody, or *the parent* or person *having legal custody* or the legal guardian *of a minor may authorize, in writing, any adult person into whose care the minor has been entrusted to consent to* any x-ray examination, anesthetic, medical or surgical diagnosis or treatment and hospital care to be rendered to said minor under the general or special supervision and upon the advice of a physician and surgeon licensed under the laws of the State of Oklahoma, *or to consent* to an x-ray examination, anesthetic, dental or surgical diagnosis or treatment and hospital care to be rendered to said minor by a dentist licensed under the laws of the State of Oklahoma. * * *
> (emphasis supplied).

57. Although the **psychotherapist/patient privilege** is established by statute (12 O.S.1991 § 2503 (C)), the manner of creating a psychotherapist/patient **relationship** with **persons under legal disability** (infants or incompetents) remains steeped in the common law. Parents had at common law the power to consent to treatment for their children. *In re Guardianship of Hight*, 1944 OK 143, 148 P.2d 475, 480 (parents are the ***natural guardians*** of their minor children and ordinarily have the right to their custody, control and care); *see* Susan D. Hawkins, Note, Protecting the Rights and Interests of Competent Minors In Litigated Medical Treatment Disputes, 64 FORDHAM L. REV.2075, 2076 (1996) (surveying the history of children's legal rights).When sole legal custody of an infant is given one parent, a duty is placed on that parent to make all decisions concerning its care and control. People with power to give consent to treatment for infants generally have the power to monitor the treatment and be informed of its progress. A custodial parent ordinarily bears no duty to advise the noncustodial parent of any treatment or procedure to which consent had been given. Because Steve Myers was a stranger to the custodial status, he was not privy to the psychotherapist/patient relationship. **Phyllis Myers, the paternal grandmother, stood in an even more remote legal position.**

58. The terms of 12 O.S.1991 § 2503 (C) (Physician and Psychotherapist–Patient Privilege) provide in pertinent part:

> C. The privilege may be claimed by the patient, his guardian or conservator or the personal representative of a deceased patient. The person who was the physician or psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient.

59. The provisions of 10 O.S.1991 § 5.2 allow a noncustodial parent, *upon request*, to access a minor's medical information that is available to the custodial parent:

father before its submission to DHS officials.[60] **The only harm alleged by Myers and *shown by this record* occurred to them after the report's submission.**[61] Had the reporting statute not compelled submission of child-abuse reports, Dr. Lashley's medical records would likely have remained a private matter protected from Myers' probing eyes by the psychotherapist/patient relationship.

¶ 27 The summary-process record is totally devoid of probative documents that show any damages occasioned *by harm disconnected from the consequences* of mandatory reporting. In short, Myers have failed to meet their probative burden by a proffer of evidentiary materials that would show the psychologist's conduct in contest was outside the range of her legislatively conferred qualified reporting privilege.

## V

### SUMMARY

¶ 28 Liability will not attach to a licensed clinical psychologist protected by the statutory reporting legislation for her alleged post-reporting harm that flows from the legitimate consequences of providing information coerced by law. Reporting privilege shields the professional against **all theories of recovery** for information-occasioned harm

through the commanded submission to the authorities of child-abuse information. In short, the plaintiffs' claim to recover for harm occasioned by Dr. Lashley's allegedly substandard evaluative techniques must stand defeated by the statutory reporting privilege she invoked below.[62]

¶ 29 The evidentiary materials fail to demonstrate an actionable claim against Dr. Lashley. On this record, her conduct clearly falls short of demonstrated lack of good faith.

¶ 30 The trial court's summary judgment is affirmed.

¶ 31 HARGRAVE, C.J., HODGES, LAVENDER, SUMMERS and WINCHESTER, JJ., concur.

¶ 32 BOUDREAU, J., concurs in result.

¶ 33 KAUGER, J., concurs in part and dissents in part.

¶ 34 WATT, V.C.J., dissents.

### ¶ 35 APPENDIX A

### DR. LASHLEY'S SUMMARY PROCESS EVIDENTIARY MATERIALS

¶ 36 **Exhibit A**—Petition (1989 divorce suit)

---

Any information or any record relating to a minor child which is available to the custodial parent of the child, *upon request,* shall also be provided the noncustodial parent of the child. Provided, however, that *this right may be restricted* by the court, upon application, if such action is deemed necessary in the best interests of the child. For the purpose of this section, "information" and "record" shall include, *but not be limited to,* information and records kept by the school, *physician* and *medical facility* of the minor child.
(emphasis added).
If the request is refused, the noncustodial parent may resort to judicial proceedings to secure the requested but undelivered information. There is no statutory duty to release a child's medical information to a noncustodial parent before a request has been made. Even when a request is made, access to a child's medical history may be restricted by the court.

60. According to the plaintiffs' probative substitutes in the record, Phyllis Myers knew of no one who had been informed by Dr. Lashley about the allegations of child sexual abuse in advance of the report's submission to DHS officials. Record, Plaintiffs' Exhibit H, pages 74-75, Appendix

*infra* at ¶ 62. No contrary statement is found in the evidentiary materials.

61. Record, Plaintiffs' Exhibit H, Deposition of Phyllis Myers, pages 74-75, Appendix *infra* at ¶ 62.

62. Even if we were to answer in the affirmative the question posed by the qualifiedly concurring justice—*i.e.,* whether Dr. Lashley does owe a duty of due care to Myers "who were never her patients"—upon concluding that this is indeed the quintessence of the lawsuit, *we could not hold in Myers' favor.* This is so because, assuming a breach of duty to the children and of the same duty to Myers, *the gist of the harm Myers assert is* not in any detriment to the underage patients *but in damage to themselves,* all of which stems from the child-abuse report. In sum, no concrete benefit would be derived from confining appellate analysis to reexamining the lawsuit on Myers' theory and the trial judge's response. Were we to follow the qualifiedly concurring justice's call, our conclusion would still remain the same—**the evidentiary materials do not pierce, avoid or overcome the statutory privilege** either by demonstrated *mala fides* or by any other means.

¶ 37 **Exhibit B**—Docket sheet for 1989 divorce suit (submitted to show that several contempt citations were sought)

¶ 38 **Exhibit C**—Divorce decree (entered 11 December 1992 in 1989)

¶ 39 **Exhibit D**—Father's 8 December 1993 motion to modify visitation rights

¶ 40 **Exhibit E**—Father's application for contempt citation

¶ 41 **Exhibit F**—Deposition of Dr. Lashley (15 October 1999)

¶ 42 **Exhibit G**—Dr. R's billing statement (9 November 1993) (submitted to show Melanie's diagnosis as depressed and fatigued).

¶ 43 **Exhibit H**—Dr. Lashley's medical chart for Melanie (submitted to show that Dr. R based his referral of Melanie on concerns about anxiety, depression and possible abuse)

¶ 44 **Exhibit I**—Handwritten notes by Melanie (submitted to show that she believed she had been sexually abused by her father).

¶ 45 **Exhibit J**—Dr. Lashley's typed note (19 November 1993)

¶ 46 **Exhibit K**—Deposition of Phyllis Myers (19 September 1997)(submitted to show M.D.M. had made allegations of molestation against Phyllis Myers, which were reported to the authorities and resulted in an investigation about those allegations)

¶ 47 **Exhibit L**—Deposition of Steve Myers (13 November 1997)

¶ 48 **Exhibit M**—History and physical of Melanie conducted at the Bethany Health Center (20 February 1994)

¶ 49 **Exhibit N**—Dr. Gude's letter (1 June 1995) (submitted to show that Melanie had told another doctor that she had been sexually abused by her father)

¶ 50 **Exhibit O**—Copies of VPOs, protective orders, police and criminal reports (submitted to show that the mother and father had various domestic disputes during the period of 1988 to 1995)

¶ 51 **Exhibit P**—Court appointment of Guardian *Ad Litem* for minor children (Melissa and M.D.M.) (8–18–95)

¶ 52 **Exhibit Q**—Phyllis Myers' original petition (dated 4 January 1996)

¶ 53 **Exhibit R**—Steve Myers' original petition (dated 4 January 1996)

¶ 54 **APPENDIX B**

**MYERS' SUMMARY PROCESS EVIDENTIARY MATERIALS**

¶ 55 **Exhibit A**—Affidavit of Dr. Smith (12 January 2000)(submitted to show that Dr. Lashley used unacceptable interview techniques in the field of psychology or psychiatry which were below the standard of acceptable care for mental health providers and constituted gross professional negligence).

¶ 56 **Exhibit B**—Affidavit of Melanie Myers (7 January 2000) (submitted to show that Dr. Lashley (a) put words and ideas in Melanie's head, (b) used recall therapy; and (c) had an unprofessional relationship with Melanie).

¶ 57 **Exhibit C**—Deposition of Dr. Richard F. Swink, psychologist (7 June 1995) (submitted to show that the counseling sessions led M.D.M. and Melanie Myers to make false allegations of sexual abuse)

¶ 58 **Exhibit D**—Dr. Lashley's notes (20 January 1994) (submitted to show that she reported the allegations of sexual abuse to DHS and to Melanie's family lawyer).

¶ 59 **Exhibit E**—Dr. Lashley's deposition (15 October 1999)(submitted to show her clinical opinion that sexual abuse did occur, but that there is no concrete evidence to support her view).

¶ 60 **Exhibit F**—Bethany Police Department investigative reports of the allegations against Phyllis Myers of sexual abuse.

¶ 61 **Exhibit G**—Deposition of Doug Huchteman, Bethany police officer (16 July 1998)

¶ 62 **Exhibit H**—Deposition of Phyllis Myers (9 September 1997) (submitted to show that she was devastated by the *accusation* of child abuse and suffered emotional distress, loss of income, medical expenses and the loss of enjoyment of her grandchild).

¶ 63 **Exhibit I**—Dr. Lashley's progress report (20 February 2001)

¶ 64 **Exhibit J**—Partial transcript of application for emergency order (23 February 1994)

¶ 65 **Exhibit K**—Affidavit of Kelly Danner, former wife of Rhonda's current husband (13 January 2000).

¶ 66 **Exhibit L**—Myers' separate petitions against Dr. Lashley (4 January 1996)

¶ 67 **Exhibit M**—Deposition of Steve Myers (13 November 1997)

¶ 68 **Exhibit N**—Copy of *Peterson v. Walentiny*, 6 January 1995 (unpublished opinion of U.S. Dist. Court for the Northern District of Oklahoma, 1995 U.S. Dist. LEXIS 4290)(submitted to show that in a factually similar case, an unpublished federal court opinion held that a defendant owes a duty to a third party when examining the children to assess the possibility of sexual abuse).

BOUDREAU, J., concurring in result.

¶ 1 Although I agree with the result reached by the majority, in my view this case cannot be fairly determined without deciding, as the trial court did, whether the defendant psychologist owed a duty of care to the plaintiffs. The majority avoids the issue of duty by converting plaintiffs' claim from one for negligence to one for bad faith reporting of child abuse.

¶ 2 .Plaintiffs' legal theory of recovery is clearly professional negligence, *i.e.*, the use of allegedly substandard evaluative techniques that resulted in plaintiffs being wrongly identified as child abusers. Plaintiffs concede in their appellate brief that the psychologist is immunized from any harm occasioned by her *report* of suspected child abuse and they make no attempt to pierce the statutory reporting privilege. They point out, however, that the psychologist's conduct in this case was not limited to the *making of a report*. They contend they suffered harm because the psychologist negligently misdiagnosed the children and planted and reinforced false memories of sexual abuse in the minds of the children. They argue that to the extent their damages flow from this conduct, the psychologist cannot benefit from the immunity provided by the statutory reporting privilege.

¶ 3 The majority acknowledges plaintiffs' claim is one for negligence and that plaintiffs make no attempt to pierce the statutory privilege. Nevertheless, the majority goes on to redefine the case as one in which all of plaintiffs' harm flows from the psychologist's act of reporting. *The summary process record below does not support the assertion of the majority that all of plaintiffs' harm flowed from the psychologist's act of reporting.*

¶ 4 In seeking judgment by summary process, the moving party has the initial burden of showing that there is no substantial controversy as to any material fact. *Bowers v. Wimberly*, 1997 OK 24 ¶ 14, 933 P.2d 312, 315. The "Statement of Material Facts As To Which No Material Issue Exists" submitted by the defendant psychologist does not address the nature or origin of the harm suffered by plaintiffs. Because the defendant does not set forth any material facts relating to the origin of plaintiffs' damages, plaintiffs have no burden under Rule 13 to submit any evidentiary materials relating to the origin of their damages. By deciding this issue before it was presented as an undisputed fact, the majority has deprived plaintiffs of the opportunity to submit acceptable evidentiary materials to establish that their harm was "disconnected from the consequences of mandatory reporting."

¶ 5 This case cannot be fairly decided by treating it as one for bad faith reporting of child abuse. Rather, the case compels us to decide whether plaintiffs can maintain an action for professional negligence against the psychologist. More specifically, it requires us to answer the following question: When examining children to assess the possibility of sexual abuse, does a mental health professional owe a duty of care to the suspected abusers?

¶ 6 The first prerequisite in any negligence proceeding must be to establish the existence of a legally cognizable duty. *Wofford v. Eastern State Hosp.*, 1990 OK 77, 795 P.2d 516, 518. Duty is a question of law and may be viewed as an expression of the sum total of those considerations of policy which lead

the law to say that the plaintiff is entitled to protection. *Id.* at 519. "Of such considerations the most important in establishing duty is foreseeability." *Id.* However, foreseeability alone is not a sufficient basis for creating a new duty. In determining whether to impose a duty, we must consider the risk, foreseeability and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the actor. *See Smith v. Johnston,* 1978 OK 142, 591 P.2d 1260, 1262 n. 2; *see also* Prosser & Keeton on Torts § 53 at 359 and n. 24 (5th ed.1984).

¶ 7 When a mental health professional incorrectly diagnoses a child as having been sexually abused, the risk of harm to persons falsely accused of that abuse is clearly foreseeable. Persons falsely accused of child sexual abuse are undoubtedly exposed to a significant risk of substantial harm. They are likely to suffer great harm in both their personal and professional relationships and will invariably suffer serious damage to their reputations. The risk and foreseeability of these harms would, absent countervailing factors, call for the imposition of a legal duty of care on mental health professionals toward the suspected abusers when evaluating children for possible sexual abuse.

¶ 8 However, mental health professionals who evaluate children for possible sexual abuse perform a valuable and useful societal function. Oklahoma has a strong public policy to protect children who have been abused or neglected and who may be further threatened by the conduct of persons responsible for health, safety or welfare of such children. 21 O.S.1991 § 845 [now 10 O.S.2001 § 7102 (A)(1) ]. Toward this end, Oklahoma statutes require the reporting and investigation of suspected child abuse. 21 O.S.1991 §§ 843–848 [now 10 O.S.2001 §§ 7101 et seq.].

¶ 9 Without effective evaluation and diagnosis, instances of child sexual abuse would not be discovered in the first instance. Similarly, without evaluation and diagnosis, children who have been abused would not receive needed treatment. Accordingly, the social utility in encouraging mental health professionals to assist in the diagnosis and treatment of sexually abused children weighs against imposing a duty of care to suspected abusers.

¶ 10 The consequences of imposing a duty of care on mental health professionals beyond that owed to the patient would be significant. Imposing such a duty has the potential of discouraging mental health professionals from performing sexual abuse evaluations out of fear of liability to persons they implicate. Even those professionals willing to perform evaluations might, in close cases, conclude that no abuse has occurred based on fear of liability rather than on professional judgment. I agree with the Pennsylvania Supreme Court when it said that imposing such a duty "would necessarily change the very nature of the therapeutic treatment in that the therapist would have to constantly evaluate conflicting duties of care to determine the appropriate manner in which treatment should proceed." *Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1171 (2000).

¶ 11 Weighing all these factors, I am convinced that the societal interest in encouraging the evaluation, discovery, reporting and treatment of child sexual abuse outweighs the public benefit that persons falsely accused might derive if they were permitted to proceed in a negligence action against a mental health professional.[1] Accordingly, I would hold that when examining children to assess the possibility of sexual abuse, a mental health professional does not owe a duty of care to the suspected abusers.

1. Four other jurisdictions have held that mental health professionals do not owe a duty of care to non-patient suspected child sexual abusers. *See Trear v. Sills,* 69 Cal.App.4th 1341, 82 Cal. Rptr.2d 281 (1999); *Zamstein v. Marvasti,* 240 Conn. 549, 692 A.2d 781 (1997); *Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1171 (2000); *Bird v. W.C.W.,* 868 S.W.2d 767 (Tex.1994). The Colorado Court of Appeals has held mental health professionals do owe such a duty. *See Montoya v. Bebensee,* 761 P.2d 285 (Colo.Ct.App. 1988).